**In re The V COMPANIES and V–S Architects, Inc., Debtors.**

**No. 00–10145.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

March 8, 2002.

Marvin A. Sicherman, Richard A. Baumgart, Cleveland, OH, for The V Companies and V–S Architects, Inc.

Lenore Kleinman, Office of the United States Trustee, Cleveland, OH, for the United States Trustee.

Harry Wright, IV, Jack Rosati, Bricker & Eckler, LLP, Columbus, OH, for Board of County Commissioners of Jefferson County, OH.

### MEMORANDUM OF OPINION

PAT E. MORGENSTERN–CLARREN, Bankruptcy Judge.

The United States Trustee, joined by creditor the Board of County Commissioners of Jefferson County, Ohio, moves to convert these Chapter 11 reorganization cases to liquidation cases under Chapter 7 of the Bankruptcy Code. (Docket 290, 299).[1] The Debtors oppose conversion. (Docket 300). For the reasons stated below, the Motion to Convert is granted.

### TABLE OF CONTENTS

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 724

POSITION OF THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 724

CONVERSION OR DISMISSAL UNDER BANKRUPTCY CODE § 1112(B) . . . . . . . . . . 725

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 726

    A. The Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 726

---

1. This is the United States Trustee's second request to convert these cases. The first motion, filed in May 2000, was resolved by an agreed order and withdrawn. (Docket 101, 169, 194). The Board of County Commissioners of Jefferson, County, Ohio filed a Motion to Appoint a Chapter 11 Trustee in June 2000, which was also withdrawn. (Docket 111, docket entry for 7/13/00).

B. The Bankruptcy Filings .............................................. 727

C. The Debtors ........................................................ 728

    1. The V Companies ............................................. 728

    2. V–S Architects, Inc. .......................................... 728

D. The Debtors' Financial Operations ................................... 728

E. The Debtors' Monthly Operating Reports ............................. 729

F. Transactions with Non-debtor Entities that are Related to the Debtors ......... 731

    1. Paul V. Voinovich ........................................... 731

    2. Step 2 Development and Management Co. ...................... 732

    3. C.C.M.C. Corporation ....................................... 733

    4. 2450 Prospect Co., Ltd. ...................................... 733

    5. AEC National, Inc. .......................................... 735

    6. Vocon Design, Inc. .......................................... 736

    7. K.W. Architects, Inc. ........................................ 736

G. The Adversary Proceeding ........................................... 737

DISCUSSION ............................................................. 737

A. Cause under Bankruptcy Code § 1112(b) ............................. 737

B. Conversion v. Dismissal ............................................. 740

CONCLUSION ............................................................. 740

## JURISDICTION

The Court has jurisdiction to determine this matter under 28 U.S.C. § 1334 and General Order No. 84 entered in this district on July 16, 1984 by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## POSITION OF THE PARTIES

The United States Trustee and the Board of County Commissioners of Jeffer-son County, Ohio (the "Board") (collectively, the "Movants") move to convert these cases, citing: (1) the absence of a realistic possibility of reorganization; (2) unreasonable delay; (3) net operating losses, postpetition liabilities, and failure to comply with Chapter 11 reporting requirements; and (4) the Debtors' dealings with related entities to the detriment of the Debtors. The Debtors argue that the Movants did not prove that cause exists.[2]

---

**2.** Independence Bank, a secured creditor of The V Companies, did not respond to the Motion or participate in the hearing, but it did file a post-hearing "statement" asking that the case not be converted or dismissed even if cause exists to do so. (Docket 389). The Official Committee of Unsecured Creditors did not take a position on this issue.

### CONVERSION OR DISMISSAL UNDER BANKRUPTCY CODE § 1112(B)

Bankruptcy Code § 1112(b) provides in relevant part:

(b) ... on request of a party in interest or the United States trustee ..., and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, *including—*

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan; [and]

(3) unreasonable delay by the debtor that is prejudicial to creditors[.]

11 U.S.C. § 1112(b)(1), (2), and (3) (emphasis added).

Under § 1112(b)(1), the first question is whether the bankruptcy estate is suffering some diminution in value. *In re ABEPP Acquisition Corp.*, 191 B.R. 365, 367 (Bankr.N.D.Ohio 1996) (quoting *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)). This element can be satisfied by proving that the debtor has incurred losses or maintained a negative cash flow position after the entry of the order for relief. *In re Schriock Constr., Inc.*, 167 B.R. 569, 575 (Bankr.D.N.D.1994). The second element of (b)(1) is whether the debtor's financial affairs are such that there is a reasonable likelihood that the debtor will be rehabilitated. Rehabilitation, in this context, means "to put back in good condition; re-establish on a firm, sound basis." *In re Wright Air Lines, Inc.*, 51 B.R. 96, 100 (Bankr.N.D.Ohio 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1112.03(2) at 14 (15th ed.1980)).

Under § 1112(b)(2), cause also includes "the inability to effectuate a plan." This section focuses on whether there is a reasonable likelihood that a plan can be confirmed in a reasonable amount of time. *In re Woodbrook Assoc.*, 19 F.3d 312, 316 (7th Cir.1994). Cause exists under this section "where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason." *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989).

Cause can also be established under § 1112(b)(3) by proving "unreasonable delay by the debtor that is prejudicial to creditors." Undue delay includes a debtor's failure to provide meaningful information at any stage of the proceeding. *See In re Consol. Pioneer Mortgage Entities*, 248 B.R. 368, 378 (9th Cir. BAP 2000), aff'd, 264 F.3d 803 (9th Cir.2001).

A finding of cause is not limited to the grounds stated in § 1112(b). *See* 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting); *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990) ("Thus, in determining 'cause' for dismissal the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases."). *See also Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 392 (6th Cir.1992) (noting that bad faith may serve as a ground for dismissal, even though it is not expressly stated under § 1112(b)); H.Rep. 595, 95th Cong., 1st Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6631–32. ("The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.").

Courts have looked beyond the § 1112(b) list to find cause to convert or dismiss based on these additional factors:

(1) a debtor's failure to file required operating reports. *See In re Berryhill,* 127 B.R. 427, 433 (Bankr.N.D.Ind.1991);

(2) the filing of materially inaccurate operating reports. *See In re Continental Holdings, Inc.,* 170 B.R. 919, 929 (Bankr. N.D.Ohio 1994); and

(3) a debtor-in-possession's dereliction of its fiduciary duty to creditors. When a corporation files for protection under Chapter 11, the officers and managing employees have a fiduciary duty to creditors and shareholders. This creates an "obligation to treat all parties, not merely the shareholders, fairly." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355–56, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (holding that a Chapter 7 trustee has the power to waive the attorney-client privilege regarding pre-bankruptcy communications on behalf of the corporation). *See In re Hampton Hotel Investors, L.P.,* 270 B.R. 346, 358 (Bankr. S.D.N.Y.2001) (citing self-dealing by the debtor's principal and the court's lack of confidence in the principal's ability and inclination to comply with the fiduciary duties of a debtor in possession as cause under § 1112(b)); *Babakitis v. Robino (In re Robino),* 243 B.R. 472, 486 (Bankr. N.D.Ala.1999) (citing a debtor's willful failure to abide by court orders and his failure to act in a fiduciary capacity toward creditors as cause); and *In re Fed. Roofing Co.,* 205 B.R. 638, 642–43 (Bankr.N.D.Ala.1996) (a debtor's practice of maintaining ongoing financial transaction with insider cited as a breach of debtor in possession's fiduciary duty and cause for § 1112(b) relief).

The determination of whether relief is appropriate under the statute is made on a case-by-case basis. *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship),* 30 F.3d 734, 737 (6th Cir.1994). The party requesting relief bears the burden of proving that cause exists by a preponderance of the evidence. *See In re Woodbrook Assocs.,* 19 F.3d 312, 316 (7th Cir.1994); *In re Continental Holdings, Inc.,* 170 B.R. 919, 929 (Bankr.N.D.Ohio 1994).

## FACTS

### A. The Evidentiary Hearing

With this legal backdrop in mind, the Court turns to the facts as established at the evidentiary hearing and through the case file. The United States Trustee called Christopher Sonson, C.P.A., a Bankruptcy Analyst for the United States Trustee, as his only witness. The Board called as witnesses Paul V. Voinovich, Harry Keagler, Thomas Woods, David Douglass, and John Workley, all on cross-examination. The Debtors' witnesses included the Board's witnesses, Michael Occhinero, and V. Michael Raig.

These findings of fact reflect the Court's weighing of the evidence, including determining the credibility of the witnesses. In doing so, the Court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression. *See* FED.R.BANKR.P. 7052, incorporating FED.R.CIV.P. 52 (applied to contested matters under FED.R.BANKR.P. 9014). When the Court finds that a witness's explanation was satisfactory or unsatisfactory, it is using this definition:

The word satisfactory 'may mean reasonable, or it may mean that the Court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what

the [witness] says with reference to the [issue at hand]. He is satisfied. He no longer wonders. He is contented.'

*United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 659 (Bankr.N.D.Ohio 1990) (discussing the issue in context of Bankruptcy Code § 727) (quoting *First Texas Savings Assoc., Inc. v. Reed*, 700 F.2d 986, 993 (5th Cir.1983)).

The parties made extensive factual and legal arguments in the briefs, at trial, and in their proposed findings of fact and conclusions of law. (Docket 312, 324, 328, 386, 387, 388, 390). The Court considered all of those positions, regardless of whether they are specifically referred to in this Memorandum of Opinion.

### B. The Bankruptcy Filings

The V Companies and V–S Architects, Inc. have been involved in contentious litigation with the Board for a number of years. The dispute stems from work performed by the companies on the Jefferson County, Ohio jail. On December 15, 1999, the United States District Court for the Southern District of Ohio entered a judgment against The V Companies and V–S Architects, Inc. and in favor of the Board for more than $13 million (the "Judgment"). *Kirby Electric, Inc. v. Board of County Commissioners v. The V Companies, et al.*, Case No. C2–96–1146.

On January 7, 2000, when the companies could not post an appeal bond, they filed these Chapter 11 cases. The Judgment has not been appealed to date in part because it is the subject of post-judgment motions. The post-judgment motions have not been pursued in part because the Debtors have not retained special counsel

to do so. That, in turn, has not been done because the Debtors' original trial counsel was unwilling to continue at the hourly rates paid by the Debtors' insurance company prepetition.

The bankruptcy cases have been consolidated administratively, but not substantively. About eight months postpetition, the Debtors ostensibly filed a disclosure statement and proposed Plan of reorganization. (Docket 191, 192). After the Debtors retained new counsel, the parties in interest corrected the record to reflect that the Plan was actually proposed not by the Debtors but by insider Paul V. Voinovich, personally, through his own counsel. (Docket 235; docket entry for 12/14/00). Voinovich also filed an Amended and Second Amended Plan and disclosure statements. He filed the Second Amended Plan a few weeks after the United States Trustee filed the Motion to Convert. (Docket 264, 265, 295, 296).

The Debtors, who are jointly represented by separate counsel, have not joined in or endorsed any of the Voinovich proposed Plans, stating instead rather carefully that "[t]he Plan Proponent and his counsel appear to believe that the Second Amended Plan is confirmable, and that confirmation thereof would be beneficial to creditors." (Debtors' Response and Objection to Granting of Motion of the United States Trustee to Convert ¶ 3). (Docket 300). Because this Motion to Convert was filed first, and due to the close timing of the filing of the Second Amended Plan and disclosure statement, the latter have been held in abeyance pending a decision on this Motion.[3] The Second Amended Plan and

---

**3.** The Motion was filed on May 2, 2001 with the evidentiary hearing initially scheduled for July 3, 2001. When Debtors' counsel became seriously ill, however, the hearing was postponed several times. (Docket 309, 310, 340, 341). The hearing ultimately went forward

on August 29, August 30, August 31, September 21, and October 10, 2001. This Court held the conversion decision for a period of time to give the parties one additional opportunity to try to resolve their differences.

disclosure statement were, however, admitted into evidence at the hearing. (Debtors Exhs. 38 and 39).

## C. The Debtors

### 1. The V Companies

The V Companies ("V Co.") is an Ohio corporation that provides engineering, construction management, and other construction related services. Paul V. Voinovich ("Voinovich") is the president, sole shareholder, and a director. Harry Keagler and V. Michael Raig are vice presidents. Raig, a registered professional engineer, is responsible for the daily operations and Keagler, a registered architect, is in charge of the architects. (Voinovich Tr. August 29, 2001 at 84–85). (Docket 423).

For an architectural firm to be certified by the Ohio Board of Examiners of Architects, the person in control of the stock must be a registered architect. Voinovich is not a registered architect and V Co. does not hold an Ohio architectural license. V Co. and Voinovich are barred from bidding, contracting for, or rendering architectural services under a 1992 settlement agreement with the Ohio Board of Examiners of Architects. (Board Exh. 21). The agreement does not, however, bar them from providing services in conjunction with an architectural firm. And so, when a V Co. client requires architectural services—which happens frequently—V Co. contracts jointly with an architectural firm such as V–S Architects, Inc. Stated differently, V Co. acting with V–S Architects, Inc. can enter into contracts that V Co. cannot enter into alone.

### 2. V–S Architects, Inc.

V–S Architects, Inc. ("VS") is an Ohio architectural corporation and Keagler is the president. Keagler holds 100% of the stock in trust for Voinovich, making Voinovich the equitable owner. Voinovich is also the vice president, secretary, and treasurer. Keagler's salary is paid by V Co., with a monthly supplement from AEC National, Inc., a related company discussed further below.

As Voinovich described it, V Co. and VS "work together to provide one-stop service to clients." VS does not have any employees or separate office space. All of the architects who perform under VS contracts are employees of V Co. VS does not own any real estate. The only personal property it owns are contracts to perform architectural services and an Ohio architectural license. The Debtors did not explain how VS can perform under a contract when it does not have any employees.

VS does not receive any of the proceeds of its contracts. Instead, the funds go directly to V Co. This has been the practice since 1975 and it has continued throughout the Chapter 11 proceedings. There was no evidence that VS maintains separate financial books, records, or bank accounts. The testimony did not establish whether VS has any daily operations and, if so, who is responsible for them.

Although Keagler is the President, he knows very little about corporate matters. He is not involved with VS's financial obligations, receipt of proceeds, or books and records. He is not aware of VS's prepetition liabilities and is not familiar with the information in the operating reports filed by VS in this bankruptcy proceeding, including whether VS is current in its postpetition obligations. He is not familiar with the Second Amended Plan of reorganization for VS and V Co. filed by Voinovich.

### D. The Debtors' Financial Operations

Voinovich makes the business decisions for both Debtors, but he relies on others to

(Docket entry 12/20/01). They were unable to do so.

handle the corporate finances. In his words:

I have to spend my time on the road marketing, seeing people, et cetera. That's the only way we're going to come out of this and that's exactly what I'm doing and what I've done all my life. I have to rely though on the people that I have in place to take care of this type of thing that allows me to continue to—to get business.

(Voinovich Tr. August 29, 2001 at 41–42). (Docket 423). Or as Raig describes it, Voinovich is the company leader who looks at "the big picture and the bottom line."

Thomas Woods served as V Co.'s Vice President of Finance starting in 1993, continuing through the January 7, 2000 bankruptcy filing date, and ending in June 2001 when he left for other employment offered by Voinovich. From 1998 to 2001, he was only at V Co. about half time. Throughout his tenure, Woods oversaw the accounting department. The testimony did not address how the department was structured or staffed, just that it existed. The department's work included billing and collecting of invoices. Woods also supervised the preparation of financial records for both Debtors, which involved looking at the "finished product." In addition, he oversaw the financial records of related entities AEC National, Inc., C.C.M.C. Corporation, North Coast Villas, and 2450 Prospect Co., Ltd. Woods did not discuss accounting matters with Voinovich.

When Woods left V Co., Raig took over responsibility for the Debtors' financial operations and the finances of the related entities. Voinovich testified that he is leaving the monitoring of the finances to Raig during the reorganization efforts. (Voinovich Tr. August 29, 2001 at 43). (Docket 423). Raig is not an accountant and does not claim any particular accounting expertise.

Before the bankruptcy filing, the Debtors employed independent accountants to prepare tax returns and to do year end review and adjustments to their books. The last books reviewed by the independent accountants are the ones for the fiscal year ending August 31, 1998. The Debtors have not retained an accountant since these cases were filed. Instead, the accounting is handled by a part-time bookkeeper who works about 20 hours a month. The bookkeeper, who was not identified, is hired through an agency that provides temporary workers.

### E. The Debtors' Monthly Operating Reports

The Debtors are required to file monthly operating reports with the Court. These standard forms include an operating statement (profit and loss), balance sheet, summary of operations, monthly cash statement, and statement of compensation. The reports are certified under penalty of perjury.

Historically, as discussed above, the Debtors have operated in tandem and they have continued to do so in Chapter 11. As a result, it is quite difficult to decipher the finances of VS, even though it continues to be a separate debtor. This difficulty is compounded by the fact that for the periods ending January 2000 through May 2000, VS did not timely file its own operating reports. Instead, the V Co. reports for that period purportedly include VS operations, but the information is not listed separately. VS later filed separate reports for that period.

Raig stated that the V Co. operating reports include VS contracts in its accounts receivable because it is not possible to break them out. He does not believe that VS has any stand alone contracts. Keagler, on the other hand, testified that VS's contracts were worth between

$500,000.00 and $700,000.00 as of June 21, 2001. He did not say how he was able to break out these numbers or how he arrived at this value. Keagler and Raig also testified that the architectural license held by VS has value although they did not quantify that value. VS did not schedule the contracts or the license in its Chapter 11 filing and the VS Operating Reports do not list a value for them.

Keagler testified that all money coming into VS is immediately transferred to V Co. and that all VS expenses are paid by V Co. While other witnesses confirmed this, the VS operating reports conflict with this description. According to the July 2001 VS Operating Report, signed under penalty of perjury by Raig, VS has had $34,862.49 in revenue since the filing, has incurred total expenses of $35,944.27, and has incurred a net loss of $1,018.78. (UST Exh. 7). The same operating report includes a balance sheet stating that VS has $18.22 and no other assets. This is inconsistent with the testimony that VS has contracts and an architecture license with value.

The Debtors were not profitable for several years before the Chapter 11 filings and they did not make a profit during the first year of the reorganization proceedings. Voinovich believes that the business suffered as a result of the Jefferson County litigation. He also stated that it can often take more than a year to obtain a signed contract. According to both Voinovich and Raig, business has now improved considerably and the Debtors are obtaining new business. Raig testified that V Co. has $3.5 million in unbilled contracts which are in various stages of completion, with the profit varying by contract but typically falling in the 10–15% range. The Debtors did not provide evidence about who the outstanding contracts are with, the exact amount of anticipated profit, or the expected date of payment.

According to V Co.'s operating reports, its financial outlook is improving because its net operating loss (since filing) and postpetition liabilities are decreasing. The February 2001 Operating Report showed a total net loss (since filing) of $301,201.96. (UST Exh. 2). Later Operating Reports show this number decreasing to $191,612.82 (April 2001) and then to $28,468.70 (July 2001). (UST Exh. 1; Debtors Exh. 63). Postpetition liabilities are also shown to be decreasing to $372,064.46 (February 2001); $277,560.96 (April 2001); and then $171,698.73 (July 2001). (UST Exhs. 1 and 2; Debtors Exh. 63).

Raig acknowledged that V Co. is not current on its postpetition accounts payables. He also testified that the Debtors' attorneys have not filed a fee application and that the administrative expenses listed in Voinovich's Second Amended Plan payout do not include any amounts for their legal services. (Debtors Exh. 55). Those services have been extensive.

The United States Trustee has asked the Debtors to correct some operating reports and provide additional information, which they have attempted to do. Despite this, the accuracy of the V Co. operating reports is in considerable doubt. For example, an issue came up during the hearing about an incorrect listing of $57,000.00 "other income" in the April 2000 Operating Report. Raig testified he looked into it, stated he believed it was an error, and corrected it, thus decreasing V Co.'s declared profitability by that amount.

There are additional issues with respect to the accuracy of the monthly operating reports relating to the accrual of loan interest. Initially, V Co. posted an interest expense related to loans made by Independence Bank to 2450 Prospect Co., Ltd. (a

separate partnership that is discussed further below) on its operating reports as an accrued expense. Raig acknowledged that this should not have been done because V Co.'s obligation to 2450 Prospect on this debt was unsecured. He removed the accrued expense item in the amount of $91,311.11 in the May 2000 operating report. (Debtors Exh. 41 at endnote 1 to Form 3).

On the flip side, V Co. had prepetition loans with Independence Bank which *were* secured and for which, according to a March 21, 2000 cash collateral Order, V Co. was to accrue interest. (Docket 75). Raig admitted, however, that the V Co. operating reports do not include this accrued interest. His explanation for this deficiency was not satisfactory. Basically, he testified that V Co. did not comply with the cash collateral Order because Independence Bank had agreed to permit V Co. and Voinovich to pay the debt over 14 years at 9% interest. He did not explain why this agreement, which is not in the record in written form, would excuse the Debtors from complying with a Court order. Moreover, Raig also stated that the Debtor has concluded that Independence Bank is not secured with regard to this debt. Again, he did not explain the factual basis for this conclusion especially in light of V Co.'s acknowledgment in the cash collateral Order that the loan is secured.

## F. Transactions with Non-debtor Entities that are Related to the Debtors

The Movants introduced a great deal of evidence concerning the Debtors' financial relationships with non-Debtor individuals and entities. The thrust of the Movants' argument that the Court finds to be relevant is that the Debtors have behaved improperly since the Chapter 11 filings in these relationships to the Debtors' detriment.

### 1. Paul V. Voinovich

According to V Co.'s schedules, which are also filed under penalty of perjury, the company owes Voinovich (personally) $1,953,084.13. (Board Exh. 1 at 10 and Board Exh. 2 at 51). This amount is not, however, supported by V Co.'s financial records.

The general ledger of Voinovich's loan activity with the Debtors was introduced into evidence. The ledger shows two different loan balances for money owed by V Co. to Voinovich as of August 25, 1999: $892,868.71 and $1,811,205.17. (Board Exh. 9 at 18 and 51). Voinovich deferred to Woods and Raig for financial details and explanations. Woods could not, however, explain these discrepancies. Raig tried, stating his belief that the ledger had incorrect beginning balances and attributed the varying loan amounts to that problem. He did not, however, adequately explain why the ledgers had incorrect beginning balances and he did not give his version of what the correct beginning balance should be. There was, therefore, insufficient evidence to support his belief that the correct loan balance as of August 25, 1999 is $1,811,205.17.

There are additional inconsistencies in the V Co. records as to the amount of the Voinovich debt. For example, V Co. gave Voinovich a cognovit note for $1,811,205.17 secured by collateral described in a security agreement. Both documents are dated August 25, 1999. (Board Exh. 9 at 21–29). However, V Co. also gave Voinovich a "Conditional Assignment of Partnership Interests" executed on September 8, 1999 which references an August 31, 1999 loan in the amount of $1,212,724.69. (Board Exh. 9 at 30). David Douglass, the attorney who prepared these documents, attempted to explain this discrepancy. He testified that the cognovit note and security agreement were prepared in connection

with an IRS audit because "the IRS likes to see such things" when it audits a closely held corporation. He stated that V Co. gave him different numbers as he was preparing these items. In his view, the cognovit note and mortgage incorrectly reference August 25, 1999 as the date on which the loan balance was calculated. He felt that the loan balance stated was *not* from August 25, 1999 but from a later and more current ledger. The Court was not convinced that this explanation established the amount (if any) presently owed by V Co. to Voinovich.

Voinovich testified that V Co. owes him money, but he was not able to provide any information as to the amount of the debt. This contrasts with Voinovich's proposed Second Amended plan of reorganization which lists this liability as $1,811,205.17. (Debtors Exh. 38 at balance sheet attached as exhibit).

### 2. Step 2 Development and Management Co. ("Step 2")

Voinovich is the sole shareholder, officer, and director of Step 2. According to Voinovich, he and his secretary are the only employees. Voinovich testified that Step 2 provides consulting services to the Debtors on "development questions, some partnership questions that we have. Real estate questions. Just in general." (Voinovich Tr. August 29, 2001 at 15). (Docket 423). No witness provided a satisfactory explanation of the nature and extent of those services, particularly in light of the fact that the Debtors did not own any real estate in the last several years.

Voinovich does not receive a salary directly from the Debtors. Instead, he has used Step 2 to draw a salary, although not on a regular basis or in a set amount. Voinovich did not explain how Step 2 charges the Debtors for its services or for his salary. Voinovich also stated that he

has not drawn a salary from Step 2 for the last two to three years "because there was no money there because of the way our receivables have come in." (Voinovich Tr. August 29, 2001 at 24). (Docket 423).

There is a general ledger that shows transactions between V Co. and Step 2. For the period from November 1994 through March 31, 2000, a period covering both pre- and post-filing activity, numerous ledger entries were initially entered as debits and then "reclassified", "reversed", or "adjusted." (Board Exh. 5 at 12–30). While the reclassified entries are in different amounts, in many cases they are sizeable. (See, for example, an entry relating to a $500,000.00 check to Voinovich and another for $517,116.96. Board Exh. 5 at 12–30; entry for 3/31/96; entry for 8/31/96). There are also a significant number of petty cash entries, some of which are for thousands of dollars. (Board Exh. 5). Voinovich could not explain the nature, purpose, or terms of any of these transactions, stating that Thomas Woods could provide those details. Woods testified, however, that he was not familiar with Step 2's finances because those matters were handled by Voinovich, his secretary, and his accountants.

The ledger also shows that Step 2 owed V Co. $87,716.80 as of March 31, 2000. (Board Exh. 5 at 29–30). Despite this, V Co. did not schedule this account payable as an asset in its bankruptcy filing. Raig acknowledged this omission and offered this explanation:

we're just finishing up the '99 taxes, and these are—the time that the schedules were made, . . . these were going to be expensed. And they are zero dollars now. They will be reflected in our tax returns as an expense. And I'm informing Step 2 of that.

(Raig Tr. October 10, 2001 at 55). (Docket 427). This was not a satisfactory explanation, either standing alone or in conjunction with the other testimony.

Step 2 owned real property located in Euclid, Ohio, known as North Coast Villas.[4] (Board Exh. 6 at 1). V Co.'s schedules state that North Coast Villas owed it $28,012.61 and that North Coast Villa assets were "sold and [the] debt [is] uncollectible[.]" (Board Exh. 2 at 5). The North Coast Villa property was sold one month before the Chapter 11 cases were filed. Voinovich testified that the sale took a year and a half to complete and that he ultimately put $125,000.00 of his own money in to close the deal.

The ledger of Voinovich's officer loan account related to North Coast Villas was introduced into evidence. The ledger reflects an escrow deposit by Voinovich in the amount of $125,000.00 on December 31, 1999. The ledger also indicates, however, that as of that same date (and after the escrow amount was credited) Voinovich still owed North Coast Villas $152,333.73. (Board Exh. 6 at 12). Assuming North Coast Villas is a part of Step 2, then if Voinovich pays this money to North Coast Villas, Step 2 would potentially have enough money to pay V Co. the $87,716.80 shown on the ledger as due to V Co. Alternatively, if North Coast Villas is a separate entity, then if Voinovich paid North Coast Villas the money due to it, North Coast Villas would potentially have enough money to pay V Co. the $28,012.61 scheduled debt. Despite this, V Co. scheduled North Coast Villas as defunct and the debt as uncollectible. Although Voinovich signed the schedules under penalty of perjury, he could not explain why this debt

was scheduled as it was. (Voinovich Tr. August 29, 2001 at 59–60). (Docket 423).

### 3. C.C.M.C. Corporation ("CCMC")

CCMC, formerly known as George S. Voinovich, Inc., is a construction business. (Board Exh. 7 at 12). Voinovich is the sole shareholder, officer, director and employee. The corporation's financial information was maintained on V Co.'s computer system. According to V Co.'s bankruptcy schedules, V Co. loaned money to CCMC, the balance owed is $99,577.68, and it is uncollectible because CCMC is defunct. (Board Exh. 2 at 5). CCMC's ledger for the period June 1995 through November 30, 1999, however, shows that CCMC owed V Co. a different and larger amount: $1,202,824.67. (Board Exh. 7 at 23). Voinovich, Woods and Raig were unable to shed any light on the loan balance discrepancy.

CCMC owned real property located in Euclid, Ohio which it sold in December 1999. Although the V Co. schedules state that CCMC is defunct and uncollectible and Voinovich testified to that same effect, Woods testified that CCMC had assets other than this real property, including judgments for rent, and that money continued to come into the company after the sale. Woods testified that there was no attempt by V Co. to collect this debt from CCMC, but he did not know why.

### 4. 2450 Prospect Co., Ltd. ("2450 Prospect")

2450 Prospect is an Ohio limited partnership organized to purchase, lease and/or own real estate. (Board Exh. 8 at 3). 2450 Prospect owned real property located at 2450 Prospect Avenue, Cleveland, Ohio (the "Prospect Property"). The

---

4. On this issue, as on others, there are inconsistencies between Interrogatory answers and the hearing testimony. The testimony loosely described Step 2 as "doing business as" North Coast Villas, while the Interrogatory answers state that North Coast Villas is the name of real property owned by Step 2. (Board Exh. 6 at 1).

Debtors rented space in the Prospect Property for a number of years prepetition and for several months into the bankruptcy filing. The Debtors, however, stopped paying rent at some point.

Voinovich is the general partner of 2450 Prospect and holds a 1% interest as general partner. (Board Exh. 8 at 1–2). Voinovich is also a 25.25% limited partner and his wife, Christine Voinovich, is a 24.645% limited partner. V Co. is a 44.591% limited partner. The financial records of 2450 Prospect are kept on V Co.'s computer system. All 2450 Prospect management decisions are made by Voinovich.

Before the Chapter 11 filings, 2450 Prospect and Voinovich [5] borrowed $800,000.00 from Independence Bank in two steps. First, in October 1998, Independence Bank loaned them $350,000.00. The Note reflecting this loan is not dated until November 16, 1998, which is also the date of the second mortgage 2450 Prospect gave the bank on the Prospect Property to secure the loan. Then, in February 1999, Independence Bank loaned $450,000.00 which was secured by a third mortgage on the Prospect Property. The second Note and Mortgage are dated May 13, 1999. (Debtors Exhs. 23, 24, 25, and 26).[6] The $800,000.00 was deposited directly into a V Co. account, although there is no written loan agreement between V Co. and 2450 Prospect to support this arrangement. If there is a written loan agreement between V Co. and Independence Bank, it was not offered into evidence. Voinovich testified that 2450 Prospect did not benefit from this transaction and that he decided to

incur this debt because V Co. needed the funds.

V Co. did not schedule any debt to 2450 Prospect in the original schedules, the amended schedules filed in March 2000, or the second amended schedules filed in mid-June 2000. Nevertheless, beginning with the March 2000 operating report, V Co. listed accrued interest owed for the $800,000.00 in loans made by Independence Bank to 2450 Prospect. On June 30, 2000, V Co. filed a Third Amendment to Schedule F which scheduled a debt to 2450 Prospect in the amount of $856,920.61. (Board Exh. 4 at 4). V Co. continued to show accrued interest due on the loans on its monthly operating reports until the Prospect Property was sold. (Debtors Exhs. 43 and 44). At that point, V Co. dropped the accrued interest from the reports.

Voinovich, acting in his capacity as the general partner of 2450 Prospect, made the decision to sell the Prospect Property. He testified that he had personally advanced money to pay the interest owed by 2450 Prospect to Independence Bank on the debt. Because Voinovich felt he should be repaid for that interest, he put together a deal involving FirstMerit Bank, N.A. ("FirstMerit"). He and his wife borrowed $100,000.00 from FirstMerit on December 4, 2000. In return, Voinovich had 2450 Prospect give FirstMerit a fifth mortgage on the Prospect Property. (Debtors Exh. 29 at 2).

Voinovich completed the Prospect Property sale in February 2001. The sale proceeds ($2,100,000.00) were not sufficient to

---

5. Although Voinovich testified that 2450 Prospect borrowed the funds and that he guaranteed the obligation, the Notes show that the loans were made to 2450 Prospect and Voinovich, jointly and severally. Either way, Voinovich is personally indebted to Independence Bank for the loans.

6. No witness provided a satisfactory explanation for why Independence Bank would advance these large amounts of money without concurrent documentation.

satisfy all of the closing costs and mortgages. Although Independence Bank had mortgages that were superior to the liens held by FirstMerit and David Douglass Associates, Independence Bank permitted those other liens to be paid ahead of it from the proceeds, leaving $50,000.00 owed to Independence. No witness gave a satisfactory explanation for why Independence Bank agreed to this. Voinovich did not know any details about how it came about, but he did agree to borrow the $50,000.00 shortfall from Independence Bank personally and is now paying that debt.

Voinovich did not keep a separate calculation of how this transaction affected V Co., given its 44.591% interest in the 2450 Prospect partnership. He felt that:

> The Debtors had—the Debtor's interest—the Debtor's interest was more than taken care of in this whole thing.

(Voinovich Tr. August 29, 2001 at 159). (Docket 423). When pressed to explain further, Voinovich stated:

> ... the thing is that the Debtors, getting all the debt reduced from the bank that we loaned to the company of $750,000 plus rent plus everything else that adds up to eight or $900,000, I think more than takes care of their 44% interest they ever had in it and the rest of us took the haircut.

(Voinovich Tr. August 29, 2001 at 160). (Docket 423). The Court finds this explanation, standing alone and in combination with the rest of the testimony, to be an unsatisfactory explanation of why Voinovich as the general partner of 2450 Prospect did not separately account for V Co.'s interest in the partnership.

## 5. AEC National, Inc. ("AEC")

AEC, originally an engineering firm and formerly known as V Group of Florida, Inc., was incorporated in Florida in November 1996. (Board Exh. 10 at 1). Voi-novich is the sole shareholder. Keagler and Voinovich are officers and directors of AEC. Woods and Raig are also directors. Voinovich spends approximately three weeks a month in Florida and he testified that AEC was intended to be a place where he could "hang out." Voinovich receives an annual salary in excess of $120,000.00 from AEC. The financial records of AEC are kept on the V Co. computer system.

Prepetition, AEC could not practice architecture, was required to consult with an architectural firm to provide architectural services, and relied on the Debtors for those services. Woods testified that the Debtors would bill AEC at the end of each year for the architectural services and the amount for those services was entered on the books although it was not always paid. Voinovich's proposed Second Amended Plan of reorganization includes an insider preference analysis that states that AEC paid $459,700.00 to the Debtors in the year preceding the Chapter 11 filings and the Debtors paid AEC $132,500.00 during the same period. (Debtors Exh. 38 at Exh. F).

In May 2000 (about four months postpetition), Keagler assisted AEC in obtaining a Florida architectural license. (Board Exh. 14 at 23–24). As a result, AEC no longer needs the Debtors' architectural services. AEC continues to use the Debtors as subcontractors on some of its projects which require architectural services and pays them for their services. Voinovich makes the decision about who gets the contract, the Debtors or AEC. Voinovich testified that the Debtors benefit from this arrangement because as subcontractors, they do not bear the risk of loss on the project. This is not a satisfactory explanation for setting up a business that competes with the Debtors.

The AEC ledger of its transactions with V Co. was introduced into evidence. The ledger, which covers a period through July 24, 2000, does not include a $155,110.83 invoice from the Debtors dated December 31, 1999 for work completed and booked to AEC. (Board Exh. 10 at 24 and 60). Raig explained that this income was ultimately reported on the Debtors' financial statement as "other income." He did not explain why the invoice does not appear on the ledger.

### 6. Vocon Design, Inc. ("Vocon")

Vocon is owned entirely by Voinovich's wife, Christine Voinovich, and is operated by their children, Paul M. Voinovich, and Deborah Voinovich McCann. Vocon is in the business of interior design and space planning. Vocon's offices either are or were in the Prospect Property. Prepetition, the Debtors did work for Vocon.

### 7. K.W. Architects, Inc. ("KW")

Within a few weeks after the Chapter 11 filings, Keagler and John Workley, an architect employed by V Co., incorporated KW, an architectural company, "to carry on any and all aspects of the practice of architecture" in Ohio. (Board Exh. 21 at 175–179). They did so based on internal corporate discussions about the possibility of the Debtors converting the VS case to Chapter 7. The discussions included Keagler, Workley, Heidi Armstrong (V Co.'s in-house legal counsel), Alfonso Provenzano (a V Co. officer), and Voinovich. Keagler testified that V Co. and VS:

> had clients. We had three projects that were going under construction and it was imperative that we maintain some relationship with those clients.

(Keagler Tr. August 30, 2001 at 17). (Docket 425). He was then asked:

> Q. And you thought you could do that by just basically taking V–S to a [chapter] 7 [liquidation], leaving its creditors with nothing, and starting up with KW, right?
>
> A. That was the discussion I understood was, yes.

(Keagler Tr. August 30, 2001 at 17). (Docket 425). In other words, non-debtor KW would be in place to take over the VS contracts. (Keagler Tr. August 30, 2001 at 12–14). (Docket 425).

David Douglass, who has represented Voinovich for years, did the legal work and served as the corporation's statutory agent. The articles of incorporation list KW's place of business as the Prospect Property. (Board Exh. 21 at 175).

In May 2000, and again through the efforts of Keagler and other V Co. employees, KW obtained a Certificate of Authorization to practice architecture in Ohio. (Board Exh. 21 at 171). The application for licensure filed with the Ohio State Board of Architecture, as testified to by Keagler, lists Keagler as the responsible architect, Deborah McCann (Voinovich's daughter) as the secretary/treasurer, and Keagler and Jerry Hazelwood (an officer of the Debtors) as directors. Heidi Armstrong notarized the application. (Board Exh. 21 at 167). Workley owned 51% percent of the stock and Keagler owned 49%. Although Keagler testified that he is no longer a shareholder, he also said that he never formally sold the stock or gave it away. Workley thinks that he now owns 100% of the stock, although he did not explain how this came about.

Workley left V Co. to work for KW in September 2000, about eight months postpetition. KW moved into Vocon's office space in the Prospect Property and rents space from Vocon. The rent is so low that Workley said he could not duplicate it anywhere else. KW uses Vocon's computer system, e-mail system, fax machine, and fax number. KW uses Vocon's lawyer. KW's sole client is Vocon and Workley is

not actively looking for new clients. Workley believes KW will do $500,000.00 in business with Vocon in the next year.

Before forming KW and leaving the Debtors, Workley did architectural work that is identical to that which he now performs for KW. In particular, the work that Workley used to do for Vocon in his capacity as a V Co. employee is now done by him in his capacity as a KW owner/employee. Also, KW has received contracts for architecture work formerly performed by the Debtors, including one with Specialty Restaurant Systems. In sum, the work now being done by KW is work that formerly benefitted the Debtors.

Workley testified that KW is his business. Despite this claim, he was almost completely uninformed about his company's finances. All of KW's books, records, checks, bills, and invoices are handled by Bonnie Vargas, an accountant who works for Vocon. Workley does not even participate in paying Vargas; instead, she pays herself from the KW account for the time she spends on these matters.

### G. The Adversary Proceeding

After this Motion to Convert was submitted for decision, the Court granted the Board's motion to prosecute certain actions seeking recovery of damages against Voinovich, some of the related entities, and other individuals and entities on behalf of the Chapter 11 estates. (Docket 395, 409). The Board has now filed an adversary proceeding to pursue those issues. *Jefferson County Board of County Commissioners v. Paul V. Voinovich, et al.,* Adv.Pro. No. 02–1007.

### *DISCUSSION*

### A. Cause Under § 1112(b)

These Chapter 11 cases are now more than two years old. At this point, the fundamental factual conclusions that the Court draws based on all of the evidence are that:

(1) the Debtors' books and records are not reliable;

(2) the Debtors' managing agents and employees do not, individually or collectively, have a solid, satisfactory understanding of the Debtors' books and records or of the Debtors' overall financial condition;

(3) the Debtors' operating reports are materially inaccurate;

(4) VS, which is an architectural firm, cannot reorganize because it does not have any employees, much less any employees who are architects; and

(5) the Debtors have not met their obligations as fiduciaries for the Chapter 11 estates.

The Movants presented multiple instances where the Debtors' books and records were incomplete and/or inconsistent. Voinovich, who is the undisputed decision maker for the Debtors, deferred all financial questions to Woods and Raig. These questions included such basic financial matters as how ledger accounts were and are maintained, transactions between and among the related entities, the financial relationship between the two Debtors, the categories used by the Debtors to record transactions (such as "reclass", "reverse", and "adjust"), and other fundamental accounting procedures. While it may not be unusual for a decision maker to refer financial questions to more knowledgeable members of a financial staff, it *is* unusual for an individual at the head of two Chapter 11 Debtors to have no knowledge whatsoever about the companies' finances. The difficulties this situation poses are obvious. How is it, for example, that Voinovich was able to decide that the transactions between 2450 Prospect and V Co. essentially cancelled each other out, eliminating any

claim that V Co. had as a 2450 Prospect limited partner, if Voinovich did not understand the accounting principles, the mechanics, or the facts underlying their financial relationships? And if he did not have that knowledge, why was he the one making that decision?

Moreover, to the extent that an individual running a business in Chapter 11 does not have a full and complete grasp of the business's finances, it is reasonable to expect that he will delegate that responsibility to a knowledgeable person with the appropriate training and experience. While Voinovich testified that he delegated the responsibility to Woods and then to Raig, neither one of them had a solid understanding of the Debtors' financial workings. Time after time during his examination, Voinovich deferred financial questions to Woods and/or Raig. When Woods and Raig were questioned, however, they were unable to provide satisfactory answers to most questions. And in at least one instance, Woods said that Voinovich had the critical financial information while Voinovich said that Woods had it. (See testimony relating to transactions between V Co. and Step 2).

The inability to provide complete and accurate financial information is particularly surprising on the part of Woods, who was actually hired to oversee the "accounting department" (which was never described beyond that term). The deficiency is perhaps more understandable with Raig, who was not originally hired to be the accountant or to oversee others doing the accounting. This underscores, however, that Raig was not the right person to be put in charge of the finances upon Woods's departure.

The transfer of responsibility from Woods to Raig makes it all the more puzzling as to why the Debtors have not retained an outside accountant since these cases were filed. Instead, the Debtors have left complex finances in the hands of a part-time bookkeeper from a temporary agency supervised by an individual without an accounting background. They did not provide a satisfactory explanation for why an independent accountant was needed before the bankruptcy filings, but not after the filings.

V Co.'s dealings with Independence Bank are also worth special mention. The Movants showed that the Debtors did not keep adequate books and records with regard to the transactions where 2450 Prospect and Voinovich borrowed money from Independence Bank allegedly to assist V Co.

The Debtors' schedules are also incomplete even years after the filings. They scheduled certain assets as uncollectible, when the Debtors' officers indicated that they may in fact be collectible. Again, there was no satisfactory explanation of why this was so.

Additionally, many of the operating reports filed by the Debtors are incomplete and/or inconsistent, and most of the explanations on this point were unsatisfactory. For example, the Debtors said through some of their officers that VS and V Co. do not have separate assets, while others said that they do. The Debtors failed to file VS operating reports at all for several months. Then they filed reports that show separate assets and liabilities, but that do not include or value the two assets that VS undoubtedly does own: i.e., the architectural license and some interest in the contracts entered into jointly with V Co. The Debtors have not maintained a clear financial or operational distinction between V Co. and VS even though the two companies have not been substantively consolidated in these bankruptcy proceedings. What is clear is that VS has no employees.

Although the Debtors argue that the omissions and mistakes are typical of those made by many debtors, the Court does not find that to be the case. Debtors often do make errors in their operating reports, especially in the first months after a filing. (See, for example, minor mistakes made by these Debtors in the operating reports such as a mathematic error and an incorrect claim that a car was being leased for Voinovich). (UST Exh. 7 at Form 3; Board Exh. 9 at 4, answer to question 17). The issue here is not that kind of understandable human frailty, but the fundamental problem that the Debtors' underlying books and records are deficient and the individuals preparing and/or signing the operating reports under penalty of perjury do not have enough information to be doing so.

█ Operating reports based on insufficient books and records cannot and do not present a reliable financial picture of these Debtors. The duty to create and maintain records that accurately reflect a debtor's financial activities while under the protection of the Bankruptcy Court is one of a debtor's basic obligations. These Debtors have failed woefully in that duty despite having been given quite a long time to sort out these problems.

The Debtors have also failed in their duty to treat all parties, not just the shareholders, fairly. The breaches include the Debtors' facilitating the incorporation and transfer of business to KW. While some witnesses testified that there were legitimate reasons for incorporating KW and insisted that it is an independent operation, the Court found John Workley's testimony to be the most instructive. Workley knew nothing about the workings of his own company. That is not consistent with the Debtors' version that Workley independently determined to leave V Co. and align himself with Vocon, run by the Voi-novich children. Keagler, V Co.'s vice president, admitted that V Co. and VS decision makers set KW up specifically to take over business from VS. If that plan was only to go into operation if VS voluntarily converted to a Chapter 7, then the Debtors did not explain why they continued to aid KW after abandoning the initial plan to convert VS. KW has taken business away from VS. Certain of the Debtors' officers downplayed the profitability and kind of work performed by KW, but Workley testified that he is doing essentially the same kind of work now that he formerly did for V Co. He expects KW will do about $500,000.00 of business in the next year, which is a meaningful amount of money compared to the Debtors' estimate that they have about $3.5 million in contracts.

The Debtors also breached their fiduciary obligations when they caused AEC, a non-debtor owned by Voinovich, to obtain a Florida architectural license, thus reducing AEC's need to give business to the Debtors.

Certainly, it can be a challenge in a closely held corporation for the officers, directors, managing employees, and shareholders to recognize the distinction that must be drawn between the corporation-debtor's interests and their personal interests. Here, however, the Debtors' management does not understand that these are separate interests and they have not honored the distinction. Instead, they have engaged in questionable transactions and some self-dealing. While creditors may not be happy with the way in which a bankruptcy case unfolds, at a minimum they are entitled to reasonable assurances that the debtor's affairs are being conducted in a transparent manner with an eye to the debtor's fiduciary obligations to the creditors. That has not happened here, and the Court does not have confidence that it will ever happen.

For all of these reasons, both standing alone and together, including unreasonable delay based on the Debtors' failure to provide meaningful financial information two years post-filing, the filing of materially inaccurate operating reports, and the Debtors' failure to meet their fiduciary obligations, the Court finds that the Movants have proven that cause exists to convert these cases to Chapter 7 or to dismiss them.

### B. Conversion or Dismissal

■■■■■ Once cause is established, the Bankruptcy Code requires the Court to determine whether conversion or dismissal is in the best interest of creditors and the estates. The parties focused their debate on whether cause exists. They have not specifically addressed whether, on a finding of cause, conversion versus dismissal is in the best interest of creditors and the estate. The impact of each alternative must be considered. This requires the Court to compare the creditors' rights in a Chapter 7 bankruptcy to the rights they would have under state law upon dismissal. *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.),* 14 F.3d 240, 243 (4th Cir.1994). Additionally, the "policy of equality among creditors, fundamental to the bankruptcy law, is one of the factors to be considered" in making this determination. *Id.*

■■ Conversion will permit a Chapter 7 Trustee to continue the adversary proceeding initiated by the Board. A Trustee will also be able to examine the financial relationships discussed above to see if there are additional assets that are collectible. Finally, a Trustee may seek to continue the business operations for some period of time in order to facilitate collection of assets. Those considerations all support conversion rather than dismissal.

### CONCLUSION

For the reasons stated, the Motion to Convert is granted and these Chapter 11 cases will be converted to cases under Chapter 7 of the Bankruptcy Code. A separate Judgment will be entered reflecting this decision.