**In re ARS ANALYTICAL, LLC, Debtor.**

**No. 11–10–10373 SA.**

United States Bankruptcy Court, D. New Mexico.

July 21, 2010.

---

Arin Elizabeth Berkson, George M. Moore, Koo Im Sakayo Tong, Moore, Berkson & Gandarilla, P.C., Albuquerque, NM, for Debtor.

## *MEMORANDUM OPINION ON ASSAI-GAI ANALYTICAL LABORATO-RIES, INC.'S MOTION TO DIS-MISS AND MOTION TO CONVERT*

JAMES S. STARZYNSKI, Bankruptcy Judge.

This matter came before the Court on June 24, 2010, July 1, 2010 and July 2,

2010 for final hearing on the Motion to Dismiss (doc 49) and Motion to Convert Case (doc 47) filed by Assaigai Analytical Laboratories, Inc. ("Assaigai"), and the objections thereto filed by ARS Analytical, LLC ("Debtor" and sometimes "Buyer")(doc 58) and American Radiation Services, Inc. ("ARSI")(doc 57). Assaigai appeared through its attorneys Thuma & Walker, P.C. (David T. Thuma) and the Law Office of Marcus Garcia (Marcus Garcia). Debtor appeared through its attorney Moore, Berkson & Gandarilla, P.C. (Bonnie Gandarilla). ARSI appeared through its attorney Paul M. Kienzle, III. This is a core proceeding concerning administration of the estate. 28 U.S.C. § 157(b)(2)(A). For the reasons set forth below, the Court finds that the case should be converted to Chapter 7.

### FACTS

Pinnacle Laboratories, Inc. ("Pinnacle") filed a Chapter 11 petition in this Court on January 30, 2008. (Case No. 11–08–10239 SA). Pinnacle was a commercial laboratory located at 2709–D Pan American Freeway, NE, Albuquerque, New Mexico. On June 19, 2008, the Court granted a contested motion to convert Pinnacle to chapter 7 (doc 111) and Linda S. Bloom was appointed Chapter 7 trustee (doc 112). On July 17, 2008 the Trustee, as seller, and Dr. Mitchell Rubenstein and Phyllis Rubenstein, as proposed purchasers, filed a Joint Motion to sell assets of the Pinnacle estate free and clear of liens pursuant to section 363(b)(1). (Doc 128). The Rubensteins were Pinnacle's shareholders. (Id.) Several objections to the sale were filed. At an August 19, 2008 hearing the Court entered an Order authorizing the Trustee to conduct an auction on September 15, 2008. (Doc 155). The Trustee conducted the auction on September 15, 2008 and submitted a stipulated order approving the sale which was filed on September 23, 2008. (Doc 167). ARSI was the successful bidder at $21,000.00. (Id. ¶ 3).

ARSI is a certified government contractor located in Port Allen, Louisiana with other offices in Knoxville, Tennessee and White Rock, New Mexico. Its website claims:

> Since 1993, ARS International has provided technicians, chemists, safety professionals and field personnel to the oil and gas industry as well as the federal government. When it comes to radiological testing, we have one of the most experienced teams in the country. Our staff is made up of highly trained personnel who use the world's most advanced high-performance analytical instrumentation to provide quality data quickly and economically. Our safety officers and field personnel are technically skilled and knowledgeable of all regulatory issues.

http://www.amrad.com/.

As of June, 2008, ARSI already had an office in White Rock, New Mexico equipped with new equipment. White Rock is near Los Alamos, the home of Los Alamos National Laboratories ("LANL").

ARSI purchased the Pinnacle equipment and operated a lab out of Pinnacle's premises. ARSI's intent was to bring up the Albuquerque facility to be like White Rock's.

ARSI formed Debtor on March 27, 2009 as a New Mexico domestic limited liability company. See http://www.nmprc.state.nm.us/cii.htm. It listed its principal address as 4301 Masthead NE, Suite A, Albuquerque, New Mexico. Id. Its registered agent was Elvin J. Chavez. Id.[1] ARSI anticipated Debtor obtaining contracts with LANL.

---

**1.** These facts were also testified to at trial.

ARSI owns 80% of the interest in Debtor. The other 20% is owned by Elvin J. Chavez. (Doc 4). Daryl DeArmand is the Chief Operating Officer of both Debtor and ARSI. Danny Coleman is the Chief Executive Officer of both Debtor and ARSI. Elvin J. Chavez was President of Debtor until he resigned in March or April, 2010. There are no other officers of Debtor. Neither DeArmand or Coleman are paid a salary by Debtor. DeArmand lives in Baton Rouge, Louisiana but travels to Albuquerque about once a month. Coleman also lives in Louisiana. DeArmand thinks that Coleman has been to Albuquerque, but he is not certain.

After Debtor was formed, Debtor and Assaigai were in contact regarding the purchase of Assaigai's state-of-the-art laboratory located at 4301 Masthead NE, Albuquerque, New Mexico [2]. On June 10, 2009 (but effective as of June 15, 2009) Assaigai as "Seller" and Debtor as "Buyer" entered an Asset Purchase Agreement ("Agreement"). Exh. 1.

The Agreement recites as follows (Exh. 1, pp. 1–2.): Seller owns an analytical laboratory business that is located in leased premises at the Masthead address. ARSI (as parent company to Debtor) has formed the Debtor/Buyer as a limited liability company that will perform chemical and analytical services ("C & A Services"). ARSI wishes to become a full service environmental laboratory, which requires C & A Services. ARSI currently performs C & A Services in Louisiana and performs field and analytical services ("F & A Ser-

vices")[3] in White Rock for certain clients. Except as specified, Seller acknowledges that the transactions in the Agreement are between Seller and Buyer, and the Seller acknowledges that ARSI as parent company is not responsible and does not assume and/or guarantee any of the obligations of the Buyer. In order to provide C & A Services, Buyer needs 1) assets, 2) corporate counseling, 3) non-compete and non-solicitation agreements, and 4) a real property sub-lease for ARSI's business premises. In order for Seller to continue providing F & A Services, it will retain certain assets and needs 1) assets for it to continue providing F & A Services, 2) non-compete and non-solicitation agreements, 3) the ability to remain in certain portions of the Masthead address and/or use of certain lab facilities and equipment for a period of no more than seven months following the date of the Agreement in order to have sufficient time to relocate its business, and 4) in the case of Buyer's breach, Seller may reenter the market for C & A Services.

The Agreement's Article II sets out the terms of the C & A Asset acquisition. Paragraph 2.1 states that on the Closing Date [4] Seller shall sell and Buyer shall buy all of Seller's rights, title and interest in and to certain assets utilized in providing C & A Services (described elsewhere) but specifically omitting the "Excluded Assets" (described elsewhere). The purchase price is $2,908,317.00. Exh. 1, ¶ 2.2. The payment of the purchase price consists of a promissory note in the amount of $750,000

---

2. There is a discrepancy in the evidence on this point. Debtor's Chief Operating Officer, Daryl DeArmand, testified that after Debtor was formed Assaigai approached it to purchase the lab. In contrast, William P. Biava, Assaigai's president, testified that ARSI approached Assaigai to purchase the lab. However, the LLC formation documents lists Assaigai's address as its principal place of business (it is possible that the place of busi-

ness was amended after the initial filing). None of these observations are really material to the issues under consideration.

3. F & A Services do not include C & A Services. Exh. 1, ¶ 1.1.24.

4. Defined as the date and time at which the closing actually occurs, but not later than June 10, 2009. Agreement ¶ 3.1(a).

(to be paid pursuant to ¶ 2.6) and the balance of $2,158,317.00 to be payable over a ten year term pursuant to a consulting agreement (¶ 2.7). Paragraph 2.6 states that Seller requires an initial lump sum payment of $750,000.00 to enable Seller to pay off a creditor to release liens on the equipment being sold. Buyer, on the other hand, requires that the initial lump sum payment of $750,000.00 be financed by Seller over a period of seven months, with the last instalment payment due December 15, 2009. Upon payment of the $750,000.00 in full, Seller will obtain releases of liens and transfer all right, title and interest to Buyer at the Post Closing free of liens. A promissory note was apparently attached to the Agreement as "Exhibit 3.0", but was not included by the parties as an attachment to Exhibit 1. From the testimony presented the Court finds that the promissory note called for six monthly payments of $10,000.00 and a $690,000.00 balloon payment by December 15, 2009. Paragraph 2.9 clarifies that at closing the Seller sells all right, title and interest in the C & A Assets subject to the claims and liens of a certain creditor; upon payment of the $750,000.00 Seller will obtain releases of those claims and liens and will then convey all right, title and interest in the C & A Assets to Buyer within ten business days free of the claims and liens.

The Agreement's Article III sets out the terms of what was expected to occur on the Closing Date and Post Closing Date[5]. Paragraph 3.2 provides that at Closing, Seller, YOME[6], and the Biavas will deliver specific items identified in ¶ 7.1. Paragraph 7.1 lists the following: (a) non-compete agreements for the Biavas and Seller, (b) Seller's corporate resolution, (c) sub-lease assignment, (d) motor vehicle certificates of title for any motor vehicles included in the C & A Assets and a Bill of Sale for each vehicle (unsigned; to be signed at Post Closing), (e) the Promissory Note, (f) YOME Corporate Consulting Agreement, and (g) such other instruments and documents as Buyer may reasonably deem necessary. Paragraph 3.3 provides that at Post Closing, Seller will deliver specific items identified in ¶ 7.2. Paragraph 7.2 lists the following: (a) a Bill of Sale and Assignment conveying all C & A Assets, (b) an Affidavit of Title, (c) any novated/assigned contracts, (d) signed motor vehicle certificates of title and Bills of Sale and (e) such other instruments and documents as Buyer may reasonably deem necessary. Paragraph 3.4 provides that at Closing, Buyer, ARSI and Buyer/ARSI's "Key Employees"[7] will deliver specific items identified in ¶ 7.3. Paragraph 7.3 lists the following: (a) the purchase price as provided in ¶ 2.3, (b) non-compete agreements from Buyer, ARSI, and the Key Employees, (c) sub-lease agreement, (d) Promissory Note, (e) Corporate Consulting Agreement, (f) Buyer's corporate resolution and (g) such other instruments and documents as Seller may reasonably deem necessary. Paragraph 3.5 provides that at Post Closing, Buyer will deliver specific items identified in ¶ 7.4. Paragraph 7.4 lists the following: (a) any novated/assigned contracts and (b) such other instruments and documents as Seller may reasonably deem necessary.

The Agreement's Article VI sets out the terms for the conduct of business from the pre-effective date of the Agreement to Post Closing. Paragraph 6.1 deals with the pre-effective period and is not rele-

---

**5.** "Post Closing Date" is defined as December 15, 2009. Exh. 1, ¶ 1.1.19.

**6.** The Biavas, owners of Assaigai, organized YOME Consulting Services, Inc. ("YOME") ostensibly to provide C & A Services to Buyer for a period of ten years with all payments to be credited toward the Purchase Price.

**7.** Designated as Elvin Chavez and Danny Coleman in Agreement ¶ 2.5(e).

vant. Paragraph 6.2 describes how the parties will conduct their businesses in the shared premises using shared assets from Closing until the Post Closing date. Subparagraph (a) lists employees to be retained by Seller and allows Buyer to hire any employee not retained. Subparagraph (b) states that Buyer is responsible for all expenses arising from use of the C & A Assets and the business premises after the Effective Date. Seller will also invoice Buyer by the fifth day of the following month for any charges Buyer has incurred. Subparagraph (c) requires Buyer to account to Seller for all revenue invoiced and received from use of the C & A Assets by the fifth day of the following month. Subparagraph (d) states that Seller retains legal title to the C & A Assets pending payment in full of the $750,000.00 down payment but that Buyer has possession and use of those assets. Subparagraph (e) states that Seller allows Buyer to use the assets pending Post Closing. Subparagraph (f) governs Buyer's business during the interim period. Buyer will conduct its business in a normal and regular manner and may enter into any contracts without the consent of Seller. Buyer will use its best efforts to preserve all existing business relationships with Seller's suppliers, subcontractors, and others having business relationships with Seller. Buyer will use its best efforts to obtain customers and preserve existing customer relationships. Agreement ¶ 6.3 provides that the parties will cooperate by delivering necessary documents and in furnishing information, evidence, testimony or other assistance in connection with any actions or disputes of any nature for periods preceding Closing.

Other relevant provisions of the Agreement are as follows: Paragraph 11.5 provides that neither party shall have the right to terminate the Agreement, Promissory Note, the Sublease, or the Corporate Consulting Agreement after Closing. Paragraph 12.1 has an integration clause. Paragraph 12.7 states that the Agreement will be governed by New Mexico law. Paragraph 12.11 provides for prevailing party attorney's fees, costs and expenses. Paragraph 12.17 states that time is of the essence in the performance of all obligations in the Agreement. Paragraph 12.9 requires arbitration of all disputes arising out of or relating to the Agreement, the Sublease, the Promissory Note, the Corporate Consulting Agreement, and the Non-compete Agreements [8].

On June 12, 2009 Debtor executed a Promissory Note to ARSI in the principal amount of up to $1.2 million to evidence a revolving line of credit. Interest accrues at 6% on a 365/360 basis. The Promissory Note is due upon demand, but otherwise to be paid in monthly payments of interest only until June 11, 2010, when the entire principal plus interest is due. There is no penalty for prepayment. A late fee of 5.00% of the unpaid portion of any regularly scheduled payment or $50.00, whichever is greater, is assessed if any payment is not paid within 15 days of its due date. The Promissory Note calls for different rates of interest depending on the outstanding balance in the event of default. It also calls for attorney's fees and costs in an amount not to exceed 20.00% of the principal balance. (Debtor's Exh. B). The evidence before the Court did not show the amount advanced on this line of credit.

On June 12, 2009 Debtor also executed a Security Agreement in favor of ARSI to secure the line of credit. The collateral is described as: 1) all accounts receivable

---

**8.** The Court finds that Debtor's bankruptcy and specifically the Motion to Convert or Dismiss are not disputes arising out of or relating to the Agreement, the Sublease, the Promissory Note, the Corporate Consulting Agreement, and the Non-compete Agreements.

owed to or belonging to Debtor, and 2) all laboratory equipment and business furniture, fixtures and equipment owned or subsequently acquired by the Debtor. (Debtor's Exh. A). ARSI filed a financing statement regarding the transactions in Exhibits A and B with the New Mexico Secretary of State on November 25, 2009 [9]. (Debtor's Exh. C).

The Purchase Agreement closed and work commenced on June 15, 2009. Debtor made four of the six required $10,000.00 payments as required by the Promissory Note then made no further payments. Debtor also failed to commence monthly payments on December 15, 2009, on the consulting agreement. Therefore, $710,000 of the down payment is due Assaigai and the balance of the purchase price of $2,158,317 is due YOME.

Things did not go well for Debtor during its first six months in business. Debtor had $1,206,000 in total revenues, direct costs were $705,000 (58% of revenues), overhead was $237,000, and general and administrative expenses were $595,000 resulting in a net loss of $331,000 for the period. Exh. 9.

January was worse. Debtor had $64,000 in total revenues, direct costs were $62,000 (96% of revenues), overhead was $11,000, and general and administrative expenses were $79,000 resulting in a net loss of $88,000 for the period. Exh. 9.

On January 12, 2010 Assaigai sent Debtor a notice of default. (Objection to Debtor's Motion to Reject Equipment Lease Agreement with American Radiation Services, Inc., Doc. 55, exh. C.) Debtor filed a Chapter 11 proceeding on January 29, 2010. Debtor remained as a debtor-in-possession. 11 U.S.C. § 1107(a).

Debtor's Initial Report, exh. 9, disclosed $5,000 in bank deposits and accounts receivable of $647,854. On February 17, 2010, Debtor filed a Motion for Approval of Agreement for DIP secured financing, for use of cash collateral, providing adequate protection, for modification of stay, and to assume executory contract with ARSI. Both Assaigai and creditor First Community Bank filed objections. Debtor never pursued the motion any further and no order has been entered approving or denying the motion.

Debtor had 29 employees at the beginning of this case. Exh. 6, p. 6. DeArmand testified that the Debtor was currently operating, but only to finish up work that was on hand in May. Currently Debtor has 4 employees. Exhibit 5 is a letter Debtor sent to all its customers on or about April 15, 2010 informing them that Debtor was not taking any new work after May 1, 2010. DeArmand testified that the current budget was $–0–for revenues, and costs of about $20,000 per month for wages (including tax burden), $5,000 to $6,000 per month utilities, and whatever the attorneys were charging. His testimony omitted rent of about $20,000 and $3,000 common area charges. This projection admits a net projected loss of $48,000 per month plus attorney's fees.

DeArmand testified about the extent of Debtor's assets. Accounts receivable as of the end of June were about $514,000. He did not know how much of them were collectible [10]. He thought some of the $514,000 had been paid to Assaigai prepetition. He admitted that Debtor owed Assaigai money, but did not know how much. He admitted the existence of the Asset

---

9. This filing was within 90 days of the bankruptcy petition. Assaigai claims that this was a preferential transfer. Debtor has not made any attempts to get this lien released or explain why it has not done so.

10. DeArmand claimed that he did not know because Assaigai had locked Debtor out of its accounting system. This subject is discussed in greater detail below.

Purchase Agreement and its $2.9 million price [11]. When asked if Debtor owed $2.86 million to Assaigai DeArmand responded that it was disputable, but "yes." He also admitted that Debtor paid only a few months of the down payment installment note.

DeArmand testified that Debtor owned very little other property. Some lab equipment came with the Agreement, exh. 1, and is still subject to liens in the approximate amount of $570,000. The rest was leased from ARSI. But, Debtor filed a motion to reject this lease on May 10, 2010. Doc. 45. Debtor owns nothing else.

DeArmand testified that during the Chapter 11, Debtor had borrowed funds from ARSI. He did not know the amounts or the dates of the loans.

Debtor was past due on rent payments and common area charges for the business space in the amount of $92,000.00 when the bankruptcy was filed. From the filing to the end of June, 2010, Debtor missed five more rent payments of $20,000.00 per month plus approximately $3,000.00 per month of common area charges.

Before the bankruptcy and, to some extent, after the bankruptcy, checks paying for work done by Debtor on contracts entered into by Assaigai were made payable to Assaigai. This was contemplated by the Agreement. The parties had intended to account to each other on a regular basis but that never really happened. Consequently, as time passed, Debtor lost track of its accounting. In fact, late in 2009, Elvin Chavez asked Assaigai's president William P. Biava [12] to show him how to operate the accounting system.

The operating reports on file show that Debtor is not profitable. Exhibit A, attached hereto, is a compilation of the Debtor's monthly operating reports ("MOR") for February, 2008 to May, 2008 (Exh. 6–8 and 22) rounded to the nearest $100.

The top portion of Exhibit A is a monthly income statement with the rightmost column a cumulative income statement for the Chapter 11. The Court has adjusted the figures reported on the MOR to reflect the testimony that Debtor has not been accruing rent or common area space. No months were profitable. The cumulative loss for the Chapter 11 period is $(319,500). The Exhibit shows that direct costs were 73% of revenues. General and administrative costs were 55% of revenues.

The middle portion of Exhibit A shows the accounts receivable at the end of each month. They dropped every month. During the Chapter 11 they dropped a total of $107,600.

Accounts payable increased every month. This means that Debtor was incurring more expenses every month than

11. Debtor's liability under the Asset Purchase Agreement is not on the bankruptcy schedules. Exh. 10. Assaigai is listed only as an unsecured creditor in the amount of $125,000 with no explanation of the nature of the debt or the date incurred. Assaigai, YOME and the Biavas are listed on Schedule G as executory contracts. DeArmand stated that the debt was not listed because 1) it was disputed, 2) the balance due was for the consulting agreement but no services had yet been performed, and 3) he did not see a way to account for it on the books. However, other testimony presented explained that the consulting agreement was basically a cover by which the bulk of the purchase price would be paid, that no services were ever to be performed, and that the overall agreement was structured this way for tax reasons (consulting services could be expensed). The Court finds this to be a serious, material omission.

12. Three Biavas own Assaigai and YOME: William P. Biava, the CEO of Assaigai; his brother John A. Biava; and John's son John W. Biava, who is essentially the information technology manager for Assaigai. William Biava and John W. Biava testified at trial.

it paid. The bottom portion of Exhibit A shows the amount that the accounts payable increased every month. The opening figure for January 31, 2010 accounts payable ($691,400) appears on Exh. 9, the Initial Report. Again, because Debtor was not accruing rent or common area charges of $23,000 per month, this amount was added. Exhibit A shows that payables increased $333,700 during the Chapter 11.

In summary, Exhibit A shows a substantial and continuing loss to and diminution of the estate. The Debtor is losing money and funding the losses by living off the accounts receivable and incurring debts beyond its ability to pay on a monthly basis. Debtor did not offer an accountant or other expert to contradict these findings.

Debtor presented an outline of a plan in an attempt to demonstrate that it could rehabilitate itself. *See* Debtor's Exh. I (Reorganization Plan Outline) and J (Reorganization Projections).

To begin with, DeArmand testified that stock will be retained by the owners under the plan; that is, ARSI would retain 80% and Chavez would retain 20%.

The Plan anticipates three phases. During phase 1, Debtor would start accepting samples again and ship them to outside labs for processing and then report the results to customers. Debtor would also process some samples with existing equipment. This phase lasts six to nine months, but the projection on Exh. J is for nine months.

During phase 1, Debtor starts with no equipment to process its own samples. Therefore, Debtor has to obtain equipment; hence the $49,500 equipment note. The Court suspects that Debtor is rejecting the equipment lease with ARSI with the intent of leasing it again later. Otherwise, there was no testimony that Debtor could obtain financing or that the amount borrowed would be adequate to equip a laboratory. Second, William Biava testified credibly that this business model for a laboratory—brokering the testing work—is simply not profitable because the gross profit margins on testing are barely enough to pay costs. The plan projection for phase 1, which lasts nine months, bears this out. Phase 1 anticipates $600,000 of revenue and expenses of $594,628, for a net profit of $5,372. However, the budget for phase 1 includes nothing for insurance, nothing for lab equipment repair or maintenance, and nothing to pay for disposal of lab waste. It also does not mention that Debtor will incur costs for moving its premises. The Plan later states that Debtor will retain key staff members, yet it budgets only $125,000 for salaries and $25,000 for payroll taxes for nine months. DeArmand testified that the current budget (when little or no work going on) was $20,000 per month for wages (including tax burden). $125,000 for nine months combined with an increase in business activities seems unrealistic. Next, Debtor's projection for subcontract analytical services and freight and delivery are $300,000 and $10,000 respectively. If these are the only direct costs, they are only 51% of revenues. Debtor has never had such a low direct cost figure. For Debtor's 2009 operations it had a 58% direct cost and for January, 2010 it had a 96% direct cost. Exhibit A, which consists of a period where Debtor was doing its own work and not shipping out, had direct costs of 73%. If the projections are correct, Debtor would be better off shipping everything out instead of trying to get back into doing its own work.

■ During phase 2, Debtor would bring its equipment online and begin operations providing a limited number of tests to customers and continuing to ship other samples to outside labs and process samples with existing equipment. This phase lasts six to nine months but the projection is for nine months. Phase 2 projects reve-

nue of $750,000, expenses of $684,500 and net profit of $65,600. There is no provision for income taxes[13]. Revenues jump by 25%, which seems high without any further explanation. Subcontract services drop to $200,000. The direct costs seem to be unrealistically low: subcontract of $200,000, freight of $15,000, lab supplies of $20,000 and perhaps some wages. The net profit margin is 8.73%.

During phase 3, Debtor would regain its status as a full service chemistry laboratory and return to processing samples in its own laboratory. Some samples will be shipped to outside labs for tests not able to be run on existing equipment. This final phase is supposed to return Debtor to its former position in the market place. The associated projection is for one year. Phase 3 projects revenue of $1,200,000, expenses of $1,138,000 and net profit of $62,000. There is no provision for income taxes. The plan anticipates Debtor moving into a much larger facility during this time, but provides no expense for the move or tenant improvements (if any). Revenues jump by 20%,[14] which seems high without any further explanation. The net profit margin drops to 5.16%.

■ Under the Debtor's projections, Debtor will profit (before tax) a total of

$132,872 in 30 months of operation. While the Court realizes this proceeding is not a confirmation hearing, the draft Plan presented by Debtor seems to be total gossamer based only on hopes of what might be. This Debtor has never been profitable. Doing a projection that suddenly shows a drastic turnaround without any convincing evidence that it is possible does not translate into actual profitability in the real world[15]. The bottom line is that Debtor started up its business with insufficient capital[16], then did not get a lucrative government contract that it hoped for[17], and then the economy went down. The Court finds the plan not feasible and, as discussed below in the Conclusions of Law section, unconfirmable.

When Debtor did not pay the $750,000 down payment, Assaigai was unable to and did not deliver the release of liens under the Agreement. Nor did Assaigai move from the premises it had been sharing with Debtor. To this date both Assaigai and Debtor share the building, a phone system and a networked computer system. All mail goes to one reception area. Assaigai has computer access to view all of Debtor's transactions. It is unclear to the Court if Debtor has reciprocal access and if it does, whether anyone at Debtor has the knowl-

**13.** Debtor had accumulated net operating losses ("NOL"s) of $393,000 by the time it filed for Chapter 11 relief. While bankruptcy generally does not result in forgiveness of debt income, it does result in reductions of certain tax attributes including NOLs. 26 U.S.C. § 108(b). Therefore, confirmation of Debtor's plan would likely wipe out the NOL carryforward.

**14.** Phase 2 was only 9 months long. Phase 2 revenues of $750,000 annualize to $1,000,000. Phase 3 is therefore a 20% rise.

**15.** [P]rojections of the income necessary to finance a plan of reorganization must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic.

*Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 90 (Bankr.S.D.Ga.2009)(citing *In re Fort Knox Mini Warehouse. Inc.*, 2002 WL 1842452, at *6 (Bankr.N.D.Iowa 2002)).

**16.** Debtor's insistence that Assaigai finance the initial down payment of $750,000 suggests that Debtor was trying to leverage itself as much as possible while risking the least amount possible.

**17.** Witnesses discussed a potential valuable contract that LANL was about to let out for bidding. The contract was not opened for bidding until a year later than expected and then LANL did not accept any bids.

edge to do so. And, they are both very angry.

Debtor attempted to establish "unusual circumstances" that would justify denial of a motion to dismiss or convert. First, DeArmand suggested the possibility that mail had been intercepted. There was no proof of this. DeArmand also suggested the possibility of Assaigai agents listening into Debtor's phone calls or answering calls meant for Debtor. Again, there was no proof offered on this issue. Finally, DeArmand tried to prove that Assaigai interfered with Debtor's access to the computer network post-petition. When questioned, however, he testified that he only knew about the interference from the accounting manager and that when they checked the problem they determined it was not caused by Debtor's computers. He assumed it was Assaigai's fault. He never told Assaigai of the problem and did not know if anyone else told Assaigai either. He finally testified that he really just did not know the cause.

John W. Biava, an engineer and vice president at Assaigai, is responsible for the computer systems at Assaigai, including remote access through a VPN [18]. The computers keep security logs, which William Biava reviewed and testified about at the trial. In January, Assaigai became concerned with the security of its data [19] so it turned off the VPN until it could be reassured that Debtor would not tamper with the data. This was resolved and the new VPN user account password was given back to Debtor. There had been a 3 to 7 day lapse in allowing outsiders (i.e., the Louisiana personnel) into the system. Local access was not impacted. And, as far as John Biava knew Debtor had continuous access after that time with one exception. On May 27, 2010, one R. Burford, employee of ARSI, was online through the VPN deleting the accounts for all the employees that were no longer at Debtor. Unfortunately, Burford apparently deleted many other accounts as well. No one at Assaigai knew of this, nor did anyone tell them until it came out at this trial on June 24, 2010 at which point it was promptly remedied by Assaigai. Other than this, John Biava believed Debtor had continuous access from January to June. The Court finds Assaigai's version of the events to be more credible than Debtor's version which is mostly based on unverified assumptions.

## CONCLUSIONS OF LAW

Assaigai filed its Motion to Convert under 11 U.S.C. § 1112(b) citing a) substantial and continuing losses to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, b) gross mismanagement of the estate, and c) failure to pay post-petition taxes. Assaigai abandoned the third ground at trial, conceding that Debtor had paid its taxes. Section 1112, **Conversion or dismissal,** provides in relevant part:

(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of

---

18. "VPN" is an acronym for "virtual private network", which is "a network that uses a public telecommunication infrastructure, such as the Internet, to provide remote offices or individual users with secure access to their organization's network [as if the user were accessing the database on site]". SearchEnterpriseWAN.com, last accessed July 20, 2010 at 4.49 pm (MDT). Debtor's accounting was mostly done at ARSI's facilities in Louisiana. This was possible through the VPN link to the Albuquerque servers.

19. After Assaigai made the demand on Debtor the tenor of their relationship changed for the worse. The unrebutted testimony of William Biava was that there was good reason to believe that Debtor was about to abscond with the backup server and probably other equipment as well. Police were called; landlord liens were filed. The server and other equipment remain at the site.

this section, and section 1104(a)(3) [20], on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)—

(I) for which there exists a reasonable justification for the act or omission; and

(II) that will be cured within a reasonable period of time fixed by the court.

(4) For purposes of this subsection, the term 'cause' includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate; . . .

■■■ In *In re Modanlo* the Bankruptcy Court for the District of Maryland described the process for a court to decide a motion to convert under the current version of Bankruptcy Code § 1112:

The mechanics of determining whether a court should convert or dismiss a case under the post-BAPCPA version of 11 U.S.C. § 1112(b) appear to be as follows: First, the movant must demonstrate that cause exists by a preponderance of the evidence. At this point, if cause has been demonstrated, the court must ascertain whether unusual circumstances exist to prevent conversion or dismissal. If no such unusual circumstances exist, the court must convert or dismiss. The non-moving party is able to try to defeat a motion to convert or dismiss the bankruptcy case by showing that unusual circumstances exist to prevent dismissal or that factors specifically set out in § 1112(b)(2)(A) and (B) exist (*e.g.,* reasonable likelihood of timely confirmation, reasonable excuse for an omission by the debtor). If these exist, the opponent to the motion to convert or dismiss prevails, unless the court determines that the best interests of the estate are otherwise. And, the court must make this best interests assessment even if the opponent does not carry its burden or even make a defense. Thus, if cause has been demonstrated (and whether or not the motion is opposed),

---

20. **§ 1104. Appointment of trustee or examiner**

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing,

the court shall order the appointment of a trustee—

(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

the court must ascertain whether the best interests of creditors and the estate are served by granting or denying the motion. *In re Hook,* 397 B.R. 544, 2008 WL 3906794, at *4 (10th Cir. BAP Aug.26, 2008) ("[Section 1112(b)(1)] allows the court to deny the motion if doing so would be in furtherance of the best interests of the creditors or the estate.")(unpublished); *In re Orbit Petroleum, Inc.,* 395 B.R. 145, 148–49 (Bankr.D.N.M.2008) ("In this case, because a plan has been filed which purports to pay all creditors in full as of the effective date ... neither conversion nor dismissal is in the best interest of the creditors of the estate.").

*In re Modanlo,* 413 B.R. 262, 271 (Bankr.D.Md.2009)(footnote omitted).

The Court finds cause to convert the case under both § 1112(b)(4)(A) and (B).

### SECTION 1112(b)(4)(A): SUBSTANTIAL OR CONTINUING LOSS TO OR DIMINUTION OF THE ESTATE AND THE ABSENCE OF A REASONABLE LIKELIHOOD OF REHABILITATION

■ To obtain relief under 11 U.S.C. § 1112(b)(4)(A), movant must show both a continuing loss or diminution and absence of a reasonable likelihood of rehabilitation. *In re Fall,* 405 B.R. 863, 867 (Bankr. N.D.Ohio 2008), *aff'd,* 2009 WL 974538 (N.D.Ohio 2009); *Vallambrosa Holdings,* 419 B.R. at 88.

■ Rehabilitation is more than reorganization. *Fall,* 405 B.R. at 867–68. It signifies something more, such as "to put back in good condition" or "to re-establish on a firm, sound basis." *Id.* (citing *In re The v. Companies,* 274 B.R. 721, 725 (Bankr.N.D.Ohio 2002)). It contemplates the successful maintenance or reestablishment of the debtor's business operations. *Vallambrosa Holdings,* 419 B.R. at 89. Rehabilitation in Chapter 11 starts with a confirmable plan. *Id.*

■ As demonstrated above, Debtor lost $319,500 in the first four months after bankruptcy. Exh. A. DeArmand testified that no new work was coming in after May 1, 2010. Projected future revenues were $–0–for some indefinite future. Projected expenses going forward would be $48,000 per month plus attorney and reorganization fees. These all demonstrate a "continuing loss."

Debtor's accounts receivable have declined $107,600 during the Chapter 11. This demonstrates a "diminution".

Debtor cannot rehabilitate. As discussed above, Debtor's plan is not feasible. It also violates the rule that administrative claims must be paid in full upon confirmation [21] and the absolute priority rule [22].

**21.** 11 U.S.C. § 1129 provides, in relevant part:

 (a) The court shall confirm a plan only if all of the following requirements are met:

 (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

 (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

**22.** 11 U.S.C. § 1129(b) provides in relevant part:

 (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

 (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements: ...

***Administrative Claims.***

Section 507(a)(2) grants priority to "administrative expenses allowed under section 503(b) of this title." Section 503(b)(1)(A) defines "the actual, necessary costs and expenses of preserving the estate" as administrative expenses. The Tenth Circuit Court of Appeals ("Tenth Circuit") has held that in order to be treated as an administrative expense, "the expense must: (1) arise out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession; and (2) benefit the debtor-in-possession in the operation of the business." *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1133 (10th Cir. 1993) (citing *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir.1988)).

*Peters v. Enterasys Networks, Inc. (In re Native American Systems, Inc.)*, 351 B.R. 135, 138 (10th Cir. BAP 2006). "Such costs and expenses encompass, without limitation, post-petition professional fees, salaries, wages, supplies, rent, utilities and other trade payables-all those ongoing operating and case administration expenses that would not likely be supplied on credit to a chapter 11 debtor without the protection of Section 507(a)'s priority scheme...." *In re Digital Impact, Inc.*, 223 B.R. 1, 6 (Bankr.N.D.Okla.1998). And, lessors are entitled to post-petition rent under this provision in the amounts required under their leases without proof of value or benefit to the estate. *El Paso Properties Corp. v. Gonzales (In re Furr's*

*Supermarkets, Inc.)*, 283 B.R. 60, 65 (10th Cir. BAP 2002).

Debtor's accounts payables increased postpetition by $241,700 (Exhibit A) and rent and common area expenses due under Debtor's lease amounts to at least $92,000. Together, this $333,700 must be paid as an administrative expense under 11 U.S.C. 1129(a)(9)(A) in cash upon confirmation. The Debtor's plan makes no reference to this and is unconfirmable on its face. *Digital Impact*, 223 B.R. at 6. Furthermore, the projections accompanying the plan show that the reorganized Debtor would profit only $132,872 in 30 months of operation (pre-tax), more evidence that Debtor cannot meet this requirement.

***Absolute Priority Rule.***

The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid. Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated. 11 U.S.C. § 1129(b)(2)(B)(ii); *Unruh v. Rushville State Bank*, 987 F.2d 1506, 1508 (10th Cir.1993). The rule reflects the different degree to which each class assumes the risk of the debtor's insolvency. *See [In re] Granite Partners [L.P.]*, 208 B.R. [332] at 337, 344 [ (Bankr.S.D.N.Y.1997) ].

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 n. 4 (10th Cir.2002). DeArmand testified that share-

---

(B) With respect to a class of unsecured claims—
 (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
 (ii) the holder of any claim or interest that is junior to the claims of such class

will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

holders would retain their interests in Debtor. Debtor's plan is not feasible and cannot pay unsecured creditors in full. It violates the absolute priority rule.

### SECTION 1112 (b)(4)(B): GROSS MISMANAGEMENT OF THE ESTATE

██ The Court also finds many examples of mismanagement of the estate. Each individual one may not be significant, but, when taken together, they amount to a gross mismanagement.

For example, DeArmand is the Chief Operating Officer. He appeared at the office maybe one day per month. Danny Coleman is the Chief Executive Officer. DeArmand was not sure Coleman ever even came to New Mexico. Elvin J. Chavez was President of Debtor until he resigned in March or April, 2010. There are no other officers of Debtor. *Compare Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.),* 374 B.R. 556, 564–65 (Bankr.M.D.Pa.2007)("Failure to maintain an effective corporate management team has been held to constitute gross mismanagement.")(Citations omitted.)

In his testimony, DeArmand did not have a good grasp of daily activities at the Debtor or the operation of the Debtor's bankruptcy estate. Many duties were delegated and not followed up on. For example, DeArmand did not prepare the MOR, seemed unfamiliar with their requirements, and delegated the duty to fill them out to someone in Louisiana. He could not state for a fact that they were accurate, and he did not know when they were filed, or why they were filed late, or when the next ones would be filed. *See id.* at 565. ("The Court believes that accurate reporting and financial transparency are important requirements in the management of a debtor-in-possession.")

DeArmand did not know the amount of the accounts receivable that were collectible. The Court therefore deduces that no one is working the collectibles. Evidence at trial established that Debtor has not invoiced LANL for work it did on an Assaigai contract since October in an amount probably over $200,000. *See Fall,* 405 B.R. at 869 (failure to pursue accounts receivable is mismanagement). He did not know the amounts of receivables that had been collected by Assaigai or recite any attempts he had made since the bankruptcy filing to reconcile the amounts other than an adversary proceeding that Debtor filed but appears presently stalled.

DeArmand knew that a Motion to Borrow was filed to legitimize transfers between Debtor and ARSI, but did not follow up on whether any order was actually entered allowing it. He saw no problem with borrowing as needed from ARSI. He knew loans were made, but did not know when or how much, but "maybe" over $100,000. *See Gateway Access Solutions,* 374 B.R. at 566 (Unapproved, unauthorized corporate borrowings on oral terms is evidence of gross mismanagement.)

After the bankruptcy DeArmand "or someone else" authorized an offset of $91,371 of debts with ARSI without notice to creditors or Court approval. Exh. 8, p. 8. He did not know if the offsets involved pre- or post-petition transactions and did not believe it was improper. The offset was done to "clean up" the books. The Debtor has made no disclosure of any actions that will or will not be taken regarding the allegedly preferential transfer to ARSI in December, 2009. It would be in the creditors' best interests to have all of these transactions reviewed by a trustee. This may be sufficient cause in itself to convert or appoint a trustee. *See Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.),* 838 F.2d 1133, 1136 (10th Cir.1988).

At trial, DeArmand accused Assaigai of interfering with their computer systems to

such an extent that Debtor could not determine its financial status and claimed that Debtor's employees were "locked out." As discussed above, the Court finds that this simply did not happen. It is Debtor's own fault that it cannot determine its financial condition.

Other examples of mismanagement include the Debtor's failure to account for post-petition rent, failure to list the liability for the Consulting Agreement on its books or bankruptcy schedules, and Debtor's apparent lack of understanding [23] of what assets it owned [24], leased, or used. Debtor has no IT department.

■ Finally, after six months in bankruptcy, the Court and creditors do not have a clear picture of Debtor's financial affairs. This is a ground to convert the case. *Fall*, 405 B.R. at 869 (citing *Gateway Access Solutions*, 374 B.R. at 565.) *See also In re Vaughan*, 429 B.R. 14, 29–30 (Bankr.D.N.M.2010)(collecting cases that find that accurate disclosure is a fundamental duty of a debtor-in-possession.)

■ Therefore, Assaigai has met its burden of proof of showing cause to convert the case under both 11 U.S.C. § 1112(b)(4)(A) and (B).

Once "cause" has been demonstrated, the Court must convert or dismiss, unless the Court specifically identifies "unusual circumstances ... that establish that such relief is not in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). However, absent unusual circumstances, the Court must not convert or dismiss a case if (1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time, (2) the "cause" for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time. 11 U.S.C. § 1112(b)(2); 7 Collier on Bankruptcy ¶ 1112.04 [1] (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev. 2008).

*In re Orbit Petroleum, Inc.*, 395 B.R. 145, 148 (Bankr.D.N.M.2008) (footnote omitted.)

■ The Courts finds no unusual circumstances that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate [25]. Debtor attempted to prove that all of its problems were caused by Assaigai but failed to prove anything other than a contract dispute (subject to arbitration). This is not unusual. Therefore, under 11 U.S.C. § 1112(b)(1) the Court "shall" convert or dismiss the case unless § 1112(b)(2) applies.

The conditions set out in Section 1112(b)(2) are not present. There is no likelihood that a plan will be confirmed with a reasonable period of time. This takes Section 1112(b)(2)(A) out of the picture. Section 1112(b)(2)(B) requires both a reasonable justification for the act or

---

**23.** DeArmand testified that he did not know if Debtor's Schedule B was accurate. He stated that no leased assets appeared on Schedule B then said he was not sure. He knew some assets had liens but did not know the amount owed or the creditor.

**24.** On its original schedules, Debtor listed ownership of various assets that appear on the Debtor's Motion to Reject Lease with ARSI.

**25.** This section of the opinion is addressed only to the finding of mismanagement. The "unusual circumstances" exception does not apply to cases involving continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation. *See* 11 U.S.C. § 1129(b)(2)(B) ("the grounds for granting such relief include an act or omission of the debtor *other than under paragraph (4)(A)*.")(Emphasis added.)

omission and a cure of the act or omission within a reasonable period of time fixed by the court. Debtor did not offer any remedial measures to cure the management failures or lack of information. Thus the standard of Section 1112(b)(2)(B) is also not met. Therefore Section 1112(b)(2) does not prevent the Court from converting the case.

 Finally, the Court finds that conversion as opposed to dismissal is in the best interests of the creditors. The record shows that there are accounts receivable to be collected. If Assaigai is correct in as-serting that ARSI's lien was preferential, a Chapter 7 trustee could avoid that lien, preserve it for the benefit of the estate and pursue collecting the receivables. The case would also benefit from a Chapter 7 trustee reviewing the transactions that have taken place with ARSI since the Debtor was formed, particularly the post-petition offset. Therefore, the Motion to Dismiss will be denied.

Orders consistent with this Memorandum Opinion will be entered separately.

Exhibit A