**In re Ralph Leo BRUTSCHE, Debtor.**

**No. 11–11–13326 SA.**

United States Bankruptcy Court,
D. New Mexico.

June 8, 2012.

Edward Alexander Mazel, Arland and Associates, Albuquerque, NM, William J. Arland, Albuquerque, NM, Aletheia Vadin Pamela Allen, Albuquerque, NM, for Debtor.

## MEMORANDUM OPINION IN SUPPORT OF ORDER CONVERTING CHAPTER 11 CASE TO CHAPTER 7 CASE

JAMES S. STARZYNSKI, Bankruptcy Judge.

The motion to dismiss this chapter 11 case (doc. 157) or to convert it to one under chapter 7 (doc. 156) pursuant to 11 U.S.C. § 1112(b) has come before the Court ("Motion"). The Court finds that it is in the best interests of the creditors and the estate that the case be converted to one under chapter 7.[1]

The Motion was filed by the Grevey–Liberman creditors, and joined by Los Alamos National Bank (doc. 158) ("Bank"), the Rodriguez creditors (J. Bernardo and Carmen Rodriguez, et al.) (Doc. 172), Santa Fe Summit Homeowners Association (doc. 179), and Santa Fe County (doc. 207). The Debtor in Possession opposed the Motion to dismiss and to convert (doc. 180)[2], joined by Felker, Ish, Ritchie & Geer, P.A. (doc. 178), and by Sommer, Karnes & Associates, LLP (by virtue of Karl Sommer's testimony during the trial). The Court conducted an evidentiary hearing on February 22 and 29 and March 1, 2012, and took the matter under advisement.

## ANALYSIS

The motion is brought pursuant to 11 U.S.C. § 1112(b), which provides in relevant part as follows:

(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the

---

1. The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L) and (O); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P.

2. Debtor subsequently consented to a dismissal (doc. 204), but then Grevey–Liberman and Bank changed their position and sought only conversion and opposed dismissal. Debtor then conceded that the Court retained discretion to dismiss or convert but urged the Court to take into consideration the Debtor's agreement to a dismissal. Debtor's Brief Regarding Court's Discretion To Dismiss or Convert Chapter 11 Bankruptcy (doc. 205) at 1. In consequence the Court need not rule on the issue of its discretion to convert the case when a creditor requests dismissal or conversion and the debtor agrees (only) to dismissal.

case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

(3) ....

(4) For purposes of this subsection, the term 'cause' includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; ...

### Rehabilitation

On June 16, 2012, this Court entered orders denying Debtor further use of cash collateral (doc. 210) and granting stay relief to the Bank (doc. 208) and Grevey–Liberman (doc. 209). The effect of those orders, particularly the stay orders, was to gut the Debtor's plan to continue his business of developing and selling the Summit real estate properties. See Memorandum Opinion Regarding Motions for Relief from Automatic Stay And Motion for Use of Cash Collateral (doc. 211) ("Stay Memorandum").[3] Debtor immediately pivoted and suggested a plan[4] by which Debtor monetized his remaining nonexempt assets and paid his creditors. Nimble as this strategy was, it fails to provide Debtor what he needs; *to wit*, the opportunity for rehabilitation.

■ Section 1112(b)(4)(A) requires that a Debtor who has incurred substantial or continuing losses to have "a reasonable likelihood of rehabilitation". "Rehabilitation" is a different and, unfortunately for Debtor, much more demanding standard than "reorganization".

Significantly, the second part of the test under section 1112(b)(4)(A) requires a reasonable likelihood of "rehabilitation", not "reorganization". Thus, the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort.

---

3. Having found in the Stay Memorandum that there was no reasonable chance for reorganization in sight, *id.* at 27 and 39 (the latter citing the single asset real estate standard of § 362(d)(3)), the Court probably needs to go no further on the issue of "absence of a reasonable likelihood of rehabilitation" since, as explained below, the rehabilitation standard is different and more demanding for a debtor to meet than what is needed for an "effective reorganization". Nevertheless, because § 1112(b)(4)(A) uses the term "rehabilitation", the Court will discuss it.

4. Debtor did not actually file the proposed plan (thus the Court's use of the term "suggested") but rather included it among his trial exhibits in an attempt to establish his ability to reorganize. The Court has no criticism of this approach.

Rehabilitation is not another word for reorganization. Rehabilitation means to reestablish a business. Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation.

7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted). *See In re Great American Pyramid Joint Venture*, 144 B.R. 780, 790 (Bkrtcy.W.D.Tenn. 1992).

> Addressing the relevant statutory grounds, it is noted that under section 1112(b)(1), the debtor's financial condition must be such as to permit the court to determine that there is no reasonable likelihood that the debtor will be rehabilitated. "Rehabilitate" has been known to mean "to put back in good condition; re-establish a firm, sound basis". Webster's New World Dictionary 1225 (World 1964). Rehabilitation, as used in section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in chapter 11.

(Case citation omitted.)

■ As noted, Debtor's business was developing and selling upscale real estate. That business is gone, so that Debtor is left, at best, with a reorganization plan by which he sells various assets and pursues litigation to generate funds to pay creditors. Debtor's plan in effect is a liquidation/litigation plan. Such a plan is perfectly legitimate as a chapter 11 "reorganization" plan. "A plan may provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests; ..." Section 1123(b)(4). And of course the Debtor as debtor in possession continues to control the assets of the estate, including the right to pursue the estate's choses in action. Sections 323 and 1107.

However, the liquidation/litigation plan is not a "rehabilitation". Debtor's business, before and during the initial stages of this chapter 11 case, only incidentally involved disposing of miscellaneous assets and litigating. Rather, the core business consisted of developing and selling real estate.[5] Debtor can no longer do that, and thus is precluded from being able to "rehabilitate" his business.[6] Debtor lacks a "profitable core around which to restructure a plan of reorganization." *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr.M.D.Ga.1986). Indeed, in closing argument Debtor's counsel conceded that the core of Debtor's rehabilitation now is litigation. Debtor's reliance that "outcomes in pending litigation favorable to him will cure his financial ills is pure speculation." *Quarles v. U.S. Trustee*, 194 B.R. 94, 97 (W.D.Va.1996).

Even were the Court to apply a more forgiving standard of whether Debtor can effectively reorganize, the Court would find that Debtor did not make a sufficient showing that he could meet that standard. The Court was left with lingering doubts (using a preponderance of the evidence standard) about whether and for how much the remaining assets could and would be disposed of.

---

5. "Debtor is not involved in any substantial business other than the operation of its real property and the activities incidental thereto." Stay Memorandum at 38.

6. This conclusion echoes the Court's statement in the Stay Memorandum:

> A review of the docket shows that there are no pending sales, so there are no expectations of business revenue for the foreseeable future. There does not seem to be a business left to reorganize.
> *Id.* at 27–28.

For example, the Court remains unconvinced about the significant net value of several of the real estate assets that Debtor proposes to liquidate. Properties that have been set aside as open space, for example, presumably were put in that status because they were not very marketable. Even with respect to the lots that are clearly marketable, the Court is hesitant to accept Debtor's valuations because of his consistent over-valuations. The result is that the Court simply cannot with any confidence assign a value to all the proposed parcels together.

In a similar vein, Debtor testified that the marketable tax credits he is pursuing have a value of $500,000 ($250,000 for his estate) for each of the four to eight tracts that would be conveyed. The proposed plan values them at $750,000 per year (with Debtor retaining 20% of the income). The Court finds that they are not nearly so valuable.

The New Mexico Administrative Code ("NMAC") contains the regulations issued by the Energy, Minerals and Natural Resources Department and the Taxation and Revenue Department of the State of New Mexico for the Land Conservation Incentives Tax Credit. NMAC 3.13.20 *et seq.*[7] The regulations provide in part that an applicant may not apply for more than one land conservation incentives tax credit per year, that the total amount of the credit shall not exceed $250,000 or 50% of the fair market value of the land donated, whichever is less, that the credit may not exceed in amount the amount of the tax due the state in the year of donation, and that the credit may be transferred to another entity only once. Debtor testified that it would take perhaps a year to make the (first?) donation effective. There was no testimony about the fair market value of the land being conveyed, and no testimony of what taxes might be due the State in the various years in the future. So the promise of $2,000,000 to $4,000,000 being available to the estate to pay creditors seems much more an expression of optimism than of future reality.

---

7. Some of the regulations are as follows:

3.13.20.8 GENERAL PROVISIONS:

. . .

F. For a donation of a fee interest in land or less-than-fee interest in land that the applicant conveys, the total amount of the land conservation incentives tax credit for the donation for which an applicant applies shall not exceed 50 percent of the fair market value of the land or interest in land that the applicant donated in perpetuity, regardless of the value of the land or interest in land donated or the number of taxpayers that own an interest in the donated property. An applicant shall only apply for one land conservation incentives tax credit per taxpayer per taxable year.

G. . . . For donations made on or after January 1, 2008, a taxpayer that owns an interest in the donated land or interest in land may receive a land conservation incentives tax credit worth the lesser of $250,000 or the taxpayer's proportionate share, as determined by the taxpayer's ownership interest in the donated land or interest in land, of 50 percent of the donated land or interest in land's fair market value. No matter the number of taxpayers that the donated land or interest in land has, the total land conservation incentives tax credit all taxpayers receive for the donated land or interest in land cannot exceed 50 percent of the donated land's or interest in land's fair market value. Therefore, if the applicant conveyed the donation on or after January 1, 2008, and there are 10 taxpayers that have an equal interest in donated land or interest in land that is worth $2,000,000, each taxpayer's land conservation incentives tax credit would be limited to $100,000.

. . .

L. A tax filer may claim the land conservation incentives tax credit against the tax liability that the Income Tax Act or the Corporate Income and Franchise Tax Act impose.

M. The amount of the land conservation incentives tax credit a tax filer uses in a taxable year may not exceed the amount of the individual income or corporate income tax otherwise due.

Finally, the Court entertains a serious doubt about whether Debtor would adequately investigate (as needed) and pursue potential claims against his spouse on behalf of the estate and particularly in order to pay any deficiency to the Bank. Debtor's commitment to do this was anything but unequivocal.[8] Thus a potential additional source of repayment to creditors becomes problematic and indeed emblematic of Debtor's entire repayment plan.

## Loss to or Diminution of Estate

■ A conclusion by itself of lack of ability to rehabilitate does not of course suffice for conversion or dismissal. *E.g., In re Alves Photo Service, Inc.*, 6 B.R. 690, 693 (Bankr.D.Mass.1980). To mandate conversion or dismissal the statute plainly requires not only the absence of a reasonable likelihood of rehabilitation but also "substantial or continuing loss to or diminution of the estate." Section 1112(b)(4)(A). There is ample evidence of such loss or diminution.[9]

The Stay Memorandum recites various post petition losses as of the date of the opinion.[10] *Id.* at 27 ($657,000 decline in equity in Summit real estate), 28–29 (cash expenditures exceeding $145,000 for items such as the home mortgage, food and other household expenses, real estate taxes and insurance, and professional fees), and 29 ($215,000 for post petition accounts payable as reported in the monthly operating reports through December 2011). Mr. Dry's January 11, 2012 appraisal (Bank exhibit 47) established that the decline in value of the Summit real estate was even steeper than recited in the Stay Memorandum (which had been based on the Dry appraisal of February 21, 2012), and resulted in a further decline in the value of the development of [$16,000,000 - $11,775,000 =] $4,225,000.

Updating the administrative expense figures, the Court has reviewed the employment applications approved in this case. Those professionals are all providing services and in the process running up bills for estate. Orders have been entered to employ Arland & Associates, LLC as chapter 11 counsel performing numerous tasks at $175–$300 per hour (doc. 36), Paul R. Cohen as special counsel for documenting the real estate donation transactions at $90–$200 per hour (doc. 59), Paul Vosburgh, CPA for accounting and testimony services at $155 per hour (doc. 61), Felker, Ish, Ritchie & Geer, P.A. as special counsel in the three state court actions com-

---

**8.** The Court is not suggesting that such hesitation on Debtor's part to sue his spouse comprises bad faith. Except in the worst of marriages (including divorces), one does not sue one's spouse, at least in the western tradition of romance and love as the basis for marriage. The Code's imperative to repay creditors on the other hand does not take into account such loyalty, and so Debtor is faced with the dilemma of either (admirable) devotion to his spouse or of more fully repaying his creditors.

**9.** Of course, a loss to the estate or diminution of value does not in itself imply any wrongdoing by Debtor.

**10.** In the Stay Memorandum, the Court erred in making the assumption that a material portion of Debtor's spending derived from "substantial cash transfers from Janice Brutsche, the nonfiling spouse." *Id.* at 28. The Court characterized these funds as "borrowing" from Janice Brutsche. *Id.* at 28 and 29. During the course of the trial on the motion to dismiss or convert, Mr. Vosburgh, Debtor's accountant, usefully corrected the Court's mistake. He explained that the funds in question were lot sale proceeds that had been deposited in an account under the name of Ms. Brutsche merely as a place to hold the funds on a temporary basis prior to the debtor-in-possession account being opened. Unfortunately for Debtor, the Court's misapprehension of this fact does not change the result reached in the Stay Memorandum.

prised of defending the Rodriguez litigation, defending the foreclosure actions against Grevey–Liberman and the Bank and pursuing the state court counterclaims against the Bank, and prosecuting the state court claims against the city of Santa Fe, all at $200–$250 per hour (doc. 76), and Sommer, Karnes & Associates, LLC for the three matters that Felker, Ish is employed for as well as for The Nature Conservancy tax credits and other real estate transactions at $195–$245 per hour (doc. 259).[11]

To be clear, the Court has no criticism of the professionals, nor of the Debtor's having hired them. Nor is the Court suggesting that the professionals are not performing valuable services that are benefitting the estate. For example, Mr. Vosburgh's documentation of the Debtor's transactions and his testimony (by deposition and in court) have been precise and lucid and particularly helpful to the Court. (Of course the final decisions about compensation, including the rates charged and measuring benefit to the estate, will be made at some later point when the Court considers compensation applications.) But professional services come at a cost, obviously, which cost needs to be factored in the calculation of gains and losses for the estate. And the

hard fact is that these costs are rapidly mounting expenses for the estate that help put the estate in the position of continuing substantial losses. *See In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr.D.N.H.2008) ("The unfortunate reality of this case is that significant administrative debt continues to increase...."; case dismissed).

The monthly operating report for March 2012[12] (doc. 257) shows total paid and accrued unpaid professional fees of $273,000, $115,000 to the Santa Fe County treasurer, plus $11,700 drawn on the Wells Fargo Bank line of credit postpetition, for an approximate total of $399,800. Total household disbursements were $272,000 as of the end of March.[13] While much of the money disbursed came from exempt assets, some came from other sources such as approximately $91,000 from a Summit Properties distribution. Although Debtor intends (presumably with Ms. Brutsche's acquiescence) to sell their current residence, which may have substantial equity, there was no testimony from Debtor that there would be a significant reduction in the Schedule I expenses of somewhat under $15,000 per month, or about $173,000 per year. Amended Summary of Schedules (doc. 185). In summary, there have

---

**11.** The Court has also approved the employment application of Sotheby's International Realty (doc. 60), but the compensation of these professionals is contingent on the sales of lots.

**12.** The March 2012 monthly operating report was not tendered or admitted into evidence during the hearing. However, the Court takes judicial notice of the monthly operating reports filed by Debtor pursuant to F.R.E. 201 and treats them as admissions by Debtor.

**13.** That figure includes the $11,704.46 which Debtor borrowed from Wells Fargo Bank, N.A. on his line of credit three days after filing his chapter 11 petition. Debtor did not

disclose the filing to Wells Fargo. Whether this is technically characterized as an unauthorized use of cash collateral or an unauthorized postpetition borrowing, as alleged by Wells Fargo (*Wells Fargo Bank, N.A. v. Brutsche*, AP 11–1169, Amended Complaint to Determine Dischargeability of Debt (doc. 2), at 2), it certainly appears to be fraudulent conduct. (In his answer, Debtor denied any fraud. Doc. 5.) For purposes of this decision, the Court does not need to decide whether such an action might constitute gross mismanagement of the estate, § 1112(b)(4)(B), or unauthorized use of cash collateral substantially harmful to 1 or more creditors. § 1112(b)(4)(D).

been substantial and continuing losses to and diminution of the estate.

**No reason not to convert or dismiss**

■ With one exception, the Court must convert or dismiss the chapter 11 case (or appoint a trustee or examiner) if it finds, as it does, that there is cause to do so. That exception is expressed in § 1112(b)(2):

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor *other than under paragraph (4)(A)*—
>
> > (i) for which there exists a reasonable justification for the act or omission; and
> >
> > (ii) that will be cured within a reasonable period of time fixed by the court.

(Emphasis added.) The statute is explicit that the Court may not rely on unusual circumstances to refuse to convert or dismiss if it finds cause under § 1112(b)(4)(A). *See In re ARS Analytical, LLC,* 433 B.R. 848, 865 n. 25 (Bankr. D.N.M.2010). Nevertheless, because Debtor argued for a finding of unusual circumstances so vigorously (hoping that

the Court would not find cause under subsection 4(A) but anticipating the Court might find cause under another part of the statute), the Court will address Debtor's arguments. (This discussion is equally useful on the issue of whether to convert or dismiss this case.)

■ Perhaps the leading case [14] applying this part of the statute is *In re Orbit Petroleum, Inc.,* 395 B.R. 145 (Bankr. D.N.M.2008). In *Orbit Petroleum,* the court found that cause existed to convert or dismiss the case because the debtor was losing money and the proposed plan of reorganization did not propose to have the debtor continue operating its business. *Id.* at 148. But the court also found an unusual circumstance in that the plan proposed a capital infusion that would pay the existing creditors in full. *Id.* In consequence, the court, deeming such an occurrence "unusual" in a chapter 11 case, conditionally denied the motion to convert or dismiss. *Id.* at 149.

Debtor's counsel in this case creatively argued that a variety of facts about this case constituted the sort of circumstances that permitted or required the Court to allow the case to remain in its chapter 11 status, or alternatively directed dismissal rather than conversion. (The Court considers the latter choice below.) The unusual circumstances include, according to Debtor, the following:

1. The character and nature of unsecured claims that remain, which are not the typical business bankruptcy type of claims. But given that not every chapter 11 case needs to be a business case, even if the debtor per se is an individual operating a business, *see Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145

---

**14.** Not surprising, since the author of the opinion, the Honorable Mark B. McFeeley, was also the author of the iconic decision of *Otero Mills, Inc. v. Security Bank & Trust (In* *re Otero Mills, Inc.),* 21 B.R. 777 (Bankr. D.N.M.), *aff'd,* 25 B.R. 1018 (D.N.M.1982), interpreting 11 U.S.C. § 105.

(1991),[15] this circumstance is not nearly unusual enough to meet the standard of § 1112(b)(2).

2. **Debtor is uniquely qualified to liquidate and turn over to the creditors the assets of the estate.** Were it the case that Debtor was the only person who could liquidate the remaining assets of the estate (such as they are), this argument would have more force. But there is no reason to think that a trustee cannot hire a competent realtor to market the real estate. A trustee can continue to employ Sommer, Karnes & Associates to complete the conservation easement tax credit transactions. Indeed, there is no reason to think that any of the professionals that Debtor has hired will not continue to work for a trustee if requested and if paid.

3. **Debtor is willing to contribute exempt assets to aid the reorganization process.** Debtor has already contributed exempt assets, as the monthly operating reports and testimony make clear. So perhaps a response of "what exempt assets remain to contribute" sounds like "what have you done for me recently?" Nevertheless, it is unclear what significant exempt assets do remain available for distribution to creditors. Those assets have not been specifically identified and pledged. A further question arises of whether those additional exempt assets will end up being used to continue to finance Debtor's annual living expenses of approximately $173,000.

4. It may be that Ms. Brutsche would be more inclined to contribute to the reorganization if Debtor were still in control than if Debtor were not. But as the Stay Memorandum made clear, it is not clear even now that Ms. Brutsche would contribute (or, for that matter, agree to a potential return of assets to the estate without litigation) simply at the request of Debtor.

5. Debtor's counsel also pointed out that Debtor was willing to share the extremely good accounting records compiled and maintained by his accountant Mr. Vosburgh. Of course it is often the case that debtors do not have good records. But admirable as Debtor's spirit of sharing is, the fact is that a trustee could compel the turnover of the records to the trustee, subject of course to any applicable privilege. Section 542(e). *See also Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1265 (10th Cir.1999):

> Section 542(e), meanwhile, authorizes a court, "[s]ubject to any applicable privilege, . . . [to] order an attorney, account-

---

**15.** In *Toibb v. Radloff*, the Supreme Court ruled that an individual not engaged in business was eligible for chapter 11. The majority rejected Justice Steven's dissent, which succinctly summarized the issue:

> Chapter 11, entitled "Reorganization," § 1101 et seq., was primarily designed to provide relief for corporate debtors but also unquestionably authorizes relief for individual proprietors of business enterprises. When the statute is read as a whole, however, it seems quite clear that Congress did not intend to authorize a "reorganization" of the affairs of an individual consumer debtor.

*Id.*, 501 U.S. at 166–67, 111 S.Ct. 2197. In this instance, although Debtor started off as an individual proprietor of a business, he is now essentially reduced to being a consumer debtor. Thus he is in the position of the debtor in *Toibb v. Radloff*, and consequently cannot by definition "rehabilitate". That being the case, should he be subject to the rehabilitation "requirement" of § 1112(b)(4)(A)? The answer would seem to be "yes", for three reasons. First, Debtor did have a business to rehabilitate at the outset of the case even though he has now lost it. Second, a debtor in possession in theory can avoid this difficulty by not sustaining continued losses or diminution of the estate. Third, merely because a debtor is eligible for chapter 11 relief does not mean that he should not be subject to all the requirements of chapter 11 as a condition of staying in chapter 11.

ant, or other person that holds recorded information ... relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e). Congress's purpose in adding § 542(e) to the Code was "to restrict ... the ability of accountants and attorneys to withhold information from the trustee," and thus to eliminate their leverage, under State-law lien provisions, to command payment before other creditors by withholding information needed to administer the estate.

(Quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 351, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).) New Mexico does not recognize an accountant-client privilege. *See* Rules 11–501 *et seq.* NMRA.

As with the first unusual circumstance, the remaining four circumstances are not so unusual that they justify not converting or dismissing the chapter 11 case for the reasons cited. And whether taken separately or together, all the "unusual" circumstances recited by Debtor's counsel are not nearly the equivalent of full payment of creditors that only Debtor can deliver. In consequence the Court finds that there are no unusual circumstances that justify not converting or dismissing the chapter 11 case.

### Conversion or Dismissal

Having found cause under § 1112(b)(4)(A), the Court cannot leave Debtor in control of the case. None of the parties have argued for the appointment of a chapter 11 trustee or an examiner, as permitted by § 1112(b)(2). Understandably so: the litigation has already provided much of the information that an examiner would find. And if the purpose of the trustee would be to continue the development work, it is hard to imagine a trustee doing anywhere near as good a job as Debtor, even if that were now possible with the development now in foreclosure. If the purpose of a chapter 11 trustee would be to assess the estate and liquidate, there is nothing to suggest a chapter 7 trustee would not be the better and simpler choice.

That leaves the Court with the choice of dismissal or conversion. Debtor has standing to move for dismissal, § 1112(b) ("on request of a party in interest"); *In re Products Intern. Co.*, 395 B.R. 101, 107 (Bankr.D.Ariz.2008), and as the movant in effect in this case[16], bears the burden of persuading the Court to dismiss the case rather than convert it. *In re Pittsfield Weaving Co.*, 393 B.R. at 274, citing § 1112(b)(1); *compare* §§ 1208(b) and 1307(b) ("On request of the debtor at any time ..., the court shall dismiss a case under this chapter."). The Court opts for conversion, for several reasons.

First, as summarized by GL's counsel in closing, it really is the creditors' money that is being argued about.[17] Debtor is confident that if the case is dismissed, he can successfully litigate to reassemble all his assets and over time liquidate suffi-

---

16. *See* footnote 2 above.

17. There is a bit of irony in the fact that it was GL's counsel who made the remark, true though it was. Despite the efforts of GL's counsel to suggest that GL's claim might not be fully secured, and with Debtor having withdrawn his objection to the GL claim (doc. 229), it seems quite clear that at the end of a foreclosure process there will be ample collat-

eral value to pay all of GL's claim. And if the Bank wants to control any portion of the GL collateral, on which the Bank has a second lien, it will have to cash out the GL position. So when GL's counsel argued about the remaining assets being the "creditors' money", he was really not including his client in that comment.

cient of those to pay the remaining claims against him. The creditors for the most part, including the Bank with a claim that may be undersecured by close to $1,000,000 before this is over, are united in wanting a trustee to make the decisions and get them paid. It really is the creditors' money at issue, and their wishes should therefore carry considerable weight.

As explained in more detail above in the section dealing with unusual circumstances, there is little to suggest that, in the circumstances of this case where the primary asset is now effectively gone, a chapter 7 trustee cannot obtain the maximum recovery to be had for creditors from the remaining assets. A chapter 7 trustee can certainly market the real estate; trustees do that routinely. A trustee can also easily pursue the conservation tax credits; counsel is already in place and working on that. And of course a trustee can evaluate the various claims that Debtor is pursuing against the Bank (for the suite of causes of action that fall under "lender liability"), against the City of Santa Fe (for breach of contract on the water system), and against the Rodriguez creditors (defending against claims of trespass, etc.), and make a decision, in consultation with at least state court counsel, about the best course of action. Debtor's argument that, if the case were dismissed, he could do that for the creditors, has some merit, to be sure. *See City of Sioux City, Iowa v. Midland Marina, Inc. (In re Midland Marina, Inc.)*, 259 B.R. 683, 686 (8th Cir. BAP), *aff'd* 22 Fed.Appx. 680, 2001 WL 1543940 (8th Cir.2001):

> As the bankruptcy court noted in its order of dismissal, the debtor's state court claims against the City are potentially the largest assets of the estate, and the debtor's success or lack thereof in prosecuting those claims will likely determine the success or failure of the

debtor's attempt to reorganize. Under the circumstances of this case, the bankruptcy court's decision to dismiss appears justified on the grounds that dismissal would allow the debtor an opportunity to fully prosecute its claims against the City in state court.

*Id.* at 686. And the Court has little doubt that Debtor would continue to pursue those goals, especially the litigation, with fervor. But a trustee would bring to these tasks a focus on repaying creditors in the most efficient way and at the least expense possible, uninfluenced by the unbridled optimism that often clouds Debtor's vision of reality and impairs his ability to make good decisions in the current circumstances.

A trustee could also examine and if need be pursue potential claims against Debtor's spouse. Even if Debtor's understandable hesitation to pursue those claims were overcome, it is still possible that a dismissal might adversely affect the claims (if any) against Ms. Brutsche.

Debtor argues that the parties seeking conversion are for the most part not simply creditors, but also parties engaged in active litigation against him, who would likely benefit by having a trustee take control of the litigation. Debtor cites *Midland Marina* for this proposition also. "Moreover, we agree with the Bankruptcy Court's observation that the City's objection to dismissal seems to flow from the City's interest as a litigator rather than from its interest as a creditor." *Id.* at 686. The instant case, however, is much more than a largely single dispute between the debtor and one creditor, as was the case in *Midland Marina.*

It is clear, then, that conversion benefits the creditors and the estate more than dismissal.

## Conclusion

A developer almost by the very nature of the role requires optimism, and the Court surely does not fault Debtor for that attitude. Of course, we admire boundless optimism when it is successful, which we often characterize as far-sightedness and determination. When it is not successful, we are less generous in our assessments. Perhaps that is unfair, but it is also the attitude expressed in the Code as well: optimism which generates results, or can be proven to generate results, is rewarded by confirmation, whereas optimism which is not supported by reality leads to conversion or dismissal. Mr. Brutsche's previous optimism amply rewarded him (and, for that matter, the community); that same optimism now is misplaced and has been a detriment to his reorganization. Therefore, for the reasons set out in this Memorandum Opinion, the Court will enter an order converting this case from one under chapter 11 to one under chapter 7 of the Code.